Filed 7/31/14  P. v. Sindaha CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SAMI MICHAEL SINDAHA,<br><br>    Defendant and Appellant. | G047750<br><br>(Super. Ct. No. M-10734)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Ronald Richard Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Bradley Weinreb and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

Sami Michael Sindaha appeals from a judgment after the jury found true a petition to commit him as a sexually violent predator (SVP). Sindaha argues there was insufficient evidence he is an SVP, the Sexually Violent Predator Act (the SVPA) violated his due process rights, the trial court committed numerous instances of instructional error, the court erred in admitting evidence, there was cumulative error, and the matter must be remanded for a hearing to determine whether the SVPA violated the equal protection clause. None of his contentions have merit, and we affirm the judgment.

FACTS

In July 1984, 21-year old Sindaha followed 12-year and 10-month old Joseph S. into the men's locker room of a community pool and started a conversation with him. Sindaha grabbed Joseph's arm, pulled him into a bathroom stall, covered his mouth, and locked the door. Sindaha sat Joseph on his lap, told him to not make any noise, put his hand down Joseph's swim trunks, and fondled his penis. In May 1985, the jury convicted Sindaha of violating Penal Code section 288, subdivision (b), and the trial court sentenced him to eight years in prison. He was released in 1989, violated parole, was returned to custody, and was paroled again in 1992.

In February 1994, 31-year old Sindaha met and befriended Rena Z., a single mother of four children, including 13-year-old David Z. who was about four and one-half feet tall. One day, Rena gave Sindaha permission to take David to the movies. Instead, Sindaha took David to a friend's house where they smoked marijuana and drank beer. Sindaha then took him to a motel. At the motel, Sindaha told David to take a shower, which he did. Sindaha went into the bathroom wearing only his underwear, and as he stroked his penis, he pulled back the shower curtain. Sindaha told David he should stroke his own penis, and David told him to get out of the bathroom, which he eventually did taking David's clothes from the bathroom floor. When David finished showering and realized his clothes were gone, he saw them on a closet shelf too high for him to reach. After he was unsuccessful in reaching his clothes, David laid down on one of the two

2

beds.  Sindaha laid down next to David, pulled down his boxers, grabbed his penis, and stroked it for about 15 minutes.  Sindaha told David, "This is how you make love to a woman . . . ." and got on top of David and grinded his crotch against David's crotch. Sindaha also kissed him.  Sindaha turned David over and did the same thing.  Sindaha eventually went to the other bed and fell asleep.  Sindaha took David to Knott's Berry Farm the next morning and later that evening took him home.  The jury convicted Sindaha of two counts of violating Penal Code section 288, subdivision (a), and the trial court, because of prior conviction enhancements, sentenced him to 18 years in prison.

In November 2005, the Orange County District Attorney filed a petition to commit Sindaha as an SVP pursuant to Welfare and Institutions Code section 6600 et seq.[1]  The prosecution supported the petition with reports from psychologists Hy Malinek and Mark A. Schwartz.  In January 2006, Sindaha was moved from prison to Coalinga State Hospital (Coalinga).  In August 2009, the trial court ruled there was probable cause to conclude Sindaha is likely to engage in sexually violent predatory criminal behavior upon release.

Before trial, Sindaha filed a motion in limine concerning many items, two of which are relevant here.  First, relying on *People v. Krah* (2003) 114 Cal.App.4th 534 (*Krah*), he argued the trial court should exclude any evidence concerning parole and parole conditions for sex offenders.  Second, he argued the court should preclude the use of the phrase "sexually violent predator" because it is unduly prejudicial.  The prosecution opposed both requests.

At a hearing on the in limine motions, the trial court denied Sindaha's motion to exclude evidence of parole because it was probative to the issue of amenability of treatment.  After stating, "I'm not suggesting there be any reference to parole conditions[,]" the court explained "that in evaluating whether or not someone is a danger

---

[1]      All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

3

in the community, . . . they can look at whether or not there's anything in place to require them to seek treatment." The court also denied Sindaha's motion to exclude any reference to the phrase "sexually violent predator" because the words are used in the statute and the jury instruction, and it is what the jury is being asked to decide. The court opined the phrase was not unduly prejudicial. Sindaha's counsel stated, "And one of these days that will work."

A jury trial began in November 2012. In addition to Joseph's, Rena's, and David's testimony as described above, the prosecution offered the following testimony.

After detailing her education, training, and experience, Carolyn Murphy, a psychologist, testified that on March 19, 2012, she interviewed Sindaha at Coalinga for about one hour. As part of her evaluation, Murphy reviewed "tens of thousands of pieces of paper," including medical records, wellness and recovery plans, police reports, and probation reports and based her opinion on the totality of what she reviewed. Murphy stated Sindaha had three qualifying offenses because he had suffered three convictions. Murphy also stated Sindaha admitted he engaged in sexual conduct with teenage male prostitutes on about a dozen occasions. And Sindaha told her he was accused of falsely imprisoning and touching a 13- or 14-year-old boy who he was attracted to and who he met at the park.

When asked, Murphy opined Sindaha had a current diagnosable mental disorder. Murphy explained he had "one qualifying mental disorder under that criterion, but that he has four diagnosed conditions that do interrelate and influence one another." She stated they were "pedophilia, sexually attracted to males, non-exclusive type." After explaining the criteria for pedophilia, "sexual attraction to children who are prepubescent generally under the age of 13[,]" Murphy admitted that when the victims are 11, 12, or 13, "a value judgment" must be made. Murphy added, "In this instance, I had no information that I can recall necessarily from the police reports that describe the victims, but I did ask [Sindaha]. And he told me that one of the victims he didn't recall pubic hair

4

or any secondary characteristics. [¶] And in another one he described him as being short and seeming to look very young." Murphy continued that she did not get any information to suggest the victims were postpubescent males who had gone through puberty early. Later, after refreshing her recollection with her report, Murphy stated Sindaha referred to David as cute and short and Joseph as young. She added Sindaha said he did not recall seeing any pubic hair or secondary sex characteristics on either victim. She opined Sindaha committed two incidents 10 years apart indicating a deviant interest and he is sexually attracted to males of all ages. She described pedophilia as chronic and generally incurable. Murphy agreed Sindaha's history established a long standing interest in children and she opined he was a menace to the health and safety of others due to his pedophilia disorder. She opined Sindaha "didn't have a really full or clear understanding of why he did what he did in his crimes and how to prevent them in the future. It's limited." Murphy also opined Sindaha had a cognitive disorder not otherwise specified (head trauma as a young child), personality disorder not otherwise specified with antisocial traits, and cannabis dependence in remission. Murphy cited to his "115's[]" rules violations in prison and disciplinary reports from Coalinga as evidence of Sindaha's antisocial traits. The disciplinary reports involve drug use, cursing at staff, losing his tempter, and spitting.

Murphy stated Sindaha's psychosexual history was somewhat inconsistent because in some reports he is identified as being bisexual but he identified himself as being homosexual as a teenager. She said Sindaha stated one of his older brothers had raped him when he was a teenager. Sindaha told Murphy he was attracted to "mostly adults." Murphy stated Sindaha had a lover at Coalinga for about two years but when it recently ended, "[h]e handled himself well, but . . . it was a little upsetting to him." When discussing his relations, including his relationships in Coalinga, Sindaha told Murphy that he does not masturbate as often when he is in a relationship. She stated, "[H]e certainly still does have a sex drive."

5

Murphy opined Sindaha was likely to reoffend.  In addition to the other factors Murphy considers in forming her opinion, i.e., her clinical judgment, she also considers the actuarial assessments, which she described as "a statistical means of providing some additional data."  She stated, "Clinical judgment is generally about the same as a coin toss.  50/50.  [¶]  There are various actuarial or statistical tools, measures, that we can use that help improve that predicted accuracy, but only improve it somewhat.  More like 70 percent.  [¶]  So it's not perfect by any means.  It's not something that I overly rely on.  It's another data point that I consider."  She stated that on the Static-99R test, Sindaha scored a "5," which meant he was in the moderate high range for reoffending.  She explained that because Sindaha received treatment at Coalinga, the moderate high range "could be compared to the high risk/high need."  She described the comparison as "a bit of a Catch 22[]" and "like a bit of circular reasoning."  Murphy said Sindaha had a 25.2 percent risk of reoffending over five years and a 35.5 percent risk of reoffending over 10 years.  On the Static-2002R, Sindaha scored a "7," which is in the moderate high-risk category.  She explained Sindaha's behavior both in and out of custody demonstrate a difficulty in controlling his conduct and complying with the law.  Murphy concluded Sindaha is an SVP and it was necessary to keep him in custody because, despite treatment, he is unable to understand why he committed the offenses, he cannot talk about it, and he does not have a plan for relapse.  When the prosecutor asked whether Sindaha would be on parole if released, Murphy said she did not believe he would be on parole but he would be subject to Penal Code section 290 registration.

On cross-examination, Murphy agreed evidence of interest in prepubescent children while housed in Coalinga would be relevant in her evaluation but children were not present there.  But she agreed hospital personnel look for other signs such as inmates watching children's shows or movies on television, child pornography, and ordering children's catalogues.  Murphy said it did not appear Sindaha engaged in any of this type of behavior.  She was aware Sindaha's IQ was 73, which is the borderline intellectual

6

functioning range. She stated Sindaha participated in anger management classes, Breaking Barriers, and Narcotics Anonymous. On redirect examination, Murphy stated the fact Sindaha committed his last child molestation offense in 1994 did not affect her opinion because he had been in custody and there are no children at Coalinga.

Sindaha testified he was 14 years old when he came out as a homosexual, but he dated men and women from the age of 14 to 20, and he was comfortable as a gay man in his late teens. He stated that before he came out, one of his older brothers raped him. He also stated he suffered a serious head injury when he was a young boy and his memory failed him. He had difficulty remembering the details of the incident with the young boy at the park. But he remembered there was a boy he was playing with who got scared and ran away. Sindaha remembered telling Murphy that he was attracted to the boy, but he denied he was attracted to him and claimed he lied a lot. He also remembered telling Murphy he frequently solicited teenage male prostitutes "but [he] could have been lying." Sindaha described Joseph as "sexy" and David as "cute" and "attractive." He admitted that at the time he molested them he was attracted to boys but he was attracted to men at the time of trial, a change he attributed to his treatment. Sindaha testified concerning the 13 incident reports he had received while at Coalinga from July 2006 to March 2011. When the prosecutor asked whether Sindaha knew he would not be on parole if he was released, he said, "Yes, sir."

On cross-examination, Sindaha testified that after his head injury he found school very difficult and his parents placed him in special education classes. He said his older brother raped him and he told his parents but they did not believe him. He stated he was scared while at Coalinga and he attributed his behavioral problems to acting "macho" so other inmates would leave him alone. He testified concerning the positive steps he had made at Coalinga while participating in the various treatment programs, including New Life, Regular Program, Tutorial Program, Positive Behavioral Support (PBS) Plan, Narcotics Anonymous, Anger Management, Breaking Barriers,

7

Medicine Wheel, church, and band class. He identified his triggers as drugs and "teenage young men[]" and explained how he would avoid both to ensure he does not reoffend.

On redirect examination, Sindaha admitted he was placed on the PBS Plan because of verbal and physical outbursts, physical altercations, and drug use. He had not drunk at Coalinga for two years and not smoked marijuana for about eight months. He admitted he drank alcohol and smoked marijuana when he molested Joseph and David. The prosecutor asked whether he was afraid he would ever be attracted to a boy again, and Sindaha claimed he does not think about boys anymore. The prosecutor asked him whether he thought about it anymore, and he answered, "Lately." When the prosecutor asked how long it had been, Sindaha finally answered seven or eight years.

After detailing his education, training, and experience, Malinek, a psychologist, testified he interviewed Sindaha three times, once in prison in 2005, once in Coalinga in February 2011, and once in Coalinga in February 2012. He also reviewed medical, police, court, and prison records. Malinek testified Sindaha suffered the requisite qualifying offenses. Also, Sindaha reported an additional incident for which he was not arrested and admitted he solicited teenage male prostitutes.

Malinek testified Sindaha had current diagnosable mental disorders, which included pedophilia, substance abuse in institutional remission, and personality disorder with antisocial and histrionic features. Malinek explained pedophilia is a sexual deviation where the individual is sexually interested in prepubescent children ages 13 or younger. Malinek opined Sindaha met the criteria for pedophilia based on his convictions and his statements he was attracted to children. He added Sindaha had difficulty complying with the law, controlling his impulses, and exercising good judgment as demonstrated by his convictions and his behavior while incarcerated, including placement in administrative segregation on four occasions, and 17 serious rule violations. He said Sindaha, "does what he wants[,]" "[t]he rules don't apply to him[,]" and he "[d]oes not learn from experience." Malinek said the fact Sindaha did not molest

8

anyone since 1995 did not change his opinion Sindaha was a pedophile because there were no children in custody. He described pedophilia as "chronic and life-long." Malinek found it important Sindaha received beneficial treatment while in prison for molesting Joseph and when he was released he molested David. Malinek stated that during his 2012 interview, he asked Sindaha whether he had ever had sexual relations with adults and he replied he did not feel comfortable having sexual relations with adults so he "'went younger.'" Malinek said he described Joseph as being 10 years old, which "supports his consistent pedophilic inclinations." Malinek stated he admitted to sexual conduct "at Coalinga which indicates his sex drive is not low at all." Sindaha told Malinek that he was attracted to young men, nothing below 16 or 17 years old, and he was not interested in children.

Based on a totality of the circumstances, Malinek opined Sindaha was "a high risk . . . to sexually reoffend." On the Static-99R test, Malinek scored Sindaha a "6," which is a "high risk" of reoffending. He said Sindaha had a 24.7 percent risk of reoffending over five years and a 30.7 percent risk of reoffending over 10 years. On the Static-2002R, Sindaha scored a "8," which correlates to a 33.4 percent risk of reoffending over five years and a 41.8 percent risk of reoffending over 10 years. Malinek described Sindaha's treatment at Coalinga as inconsistent. He added that outpatient treatment would not be effective for Sindaha. Malinek concluded Sindaha met all the criteria for an SVP. On cross-examination, Malinek testified there was no evidence any of Sindaha's sexual misconduct at Coalinga involved pedophilia.

Sindaha offered the testimony of Christopher Fisher, a psychologist. After detailing his education, training, and experience, Fisher testified he had been licensed to practice in California for three years and had done about 25 SVP evaluations. Fisher explained he did an SVP evaluation of Sindaha based on an interview with Sindaha, Murphy's and Malinek's evaluations, and a review of medical records, police records, court records, and prison records. Fisher stated Sindaha suffered the qualifying

9

convictions. As to whether he had a current mental disorder, Fisher testified his diagnosis related to Sindaha's substance abuse, antisocial personality disorder, and borderline intellectual functioning. Fisher explained he considered pedophilia but ultimately concluded Sindaha did not meet the criteria because his molestations of Joseph and David were "outliers" compared to his other sexual misconduct and he did not exhibit any pedophilic behaviors while at Coalinga. Fisher explained Sindaha's participation in programs demonstrated he was committed to improving himself, and his progress in the PBS Plan demonstrated that when people focused on him, he excelled. Fisher testified at length about the imprecise nature of evaluations, including the actuarial assessments and de minimis predictive value. Based on the actuarial assessments and the dynamic risk factors, Fisher opined Sindaha did not have a diagnosable mental disorder that predisposed him to commit sexual offenses and he did not believe Sindaha was likely to commit sexual offenses again. Fisher concluded he did not believe Sindaha qualified as an SVP under the applicable criteria.

On cross-examination, Fisher admitted Sindaha had stopped using alcohol and marijuana at Coalinga about one year before trial. On redirect examination, Fisher denied pedophilia is chronic and resistant to change.

Brian Abbott, a psychologist, also testified for Sindaha. After detailing his education, training, and experience, Abbott testified he did not do a complete SVP evaluation of Abbott but instead reviewed Murphy's and Malinek's reports to determine whether the reports supported their conclusions Sindaha suffers from a current mental disorder. Abbot discussed pedophilia at length and the criteria he relied on in determining whether a patient has a current mental disorder. He opined pedophilia could or could not be chronic and stated a person may molest a child for reasons other than pedophilia. He explained Sindaha's misbehavior at Coalinga and his sexual activity with adult males was not indicative of pedophilia. Abbott testified at length about the actuarial assessments and their margin of error in predicting future behavior.

10

Marguerite Ann Saunders, a clinical psychologist who previously worked at Coalinga, testified for Sindaha. She stated Sindaha told her he wanted to stop using illegal substances in Coalinga and with her guidance he tested clean and was awarded certificates for his progress. Suhaila Saad, Sindaha's sister, testified he suffered a head injury when he was a child that had long lasting effects. She said that if he was released she would do whatever is needed to help him. Finally, Sindaha offered testimony establishing he had been a consumer at the Regional Center and remains eligible for services there.

Sindaha requested the trial court instruct the jury with two special instructions. First, Sindaha requested the following: "'You may not find the petition true unless the prosecutor proves beyond a reasonable doubt that . . . Sindaha suffers from a diagnosable mental illness that predisposes him to commit sexually violent crimes if released. The prosecutor must prove beyond a reasonable doubt that the mental illness is sufficient to distinguish . . . Sindaha from a dangerous but typical recidivist in an ordinary case.'" (Italics added.) Next, he requested the following: "While '[d]anger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody, this does not mean that absence of such conduct may not be considered by you in reaching a verdict in this matter." (Italics added.) The prosecutor opposed both instructions.

At a hearing on the jury instructions, the trial court refused to give either of Sindaha's special instructions. With regard to the first, the recidivist instruction, the trial court stated the instruction was unnecessary because CALCRIM No. 3454 adequately provides the elements necessary to establish Sindaha is an SVP. The court added the instruction was confusing because it is unclear "what a typical recidivist is." The court concluded CALCRIM No. 3454 "covers the fact that [Sindaha] must be predisposed by virtue of a mental disease or disorder to commit these crimes." As to the second, the recent overt act instruction, the court again stated CALCRIM No. 3454 clearly provided

11

the appropriate legal standard, including the prosecutor must prove Sindaha "is a danger to the health and safety of others." The court did not find the instruction helpful because the jury was instructed on what evidence they could consider and how to consider the evidence.

As relevant here, the trial court instructed the jury with CALCRIM No. 3454, as follows: "The petition alleges that . . . Sindaha is a[n] [SVP]. [¶] To prove this allegation, the People must prove beyond a reasonable doubt that: [¶] 1. He has been convicted of committing sexually violent offenses against one or more victims; [¶] 2. He has a diagnosed mental disorder; [¶] 3. As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior; [¶] AND [¶] 4. It is necessary to keep him in custody in a secure facility to ensure the health and safety of others. [¶] The term *diagnosed mental disorder* includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others. [¶] A person is *likely to engage in sexually violent predatory criminal behavior* if there is a substantial danger, that is, a serious and well-founded risk that the person will engage in such conduct if released into the community. [¶] The likelihood that the person will engage in such conduct does not have to be greater than 50 percent. [¶] Sexually violent criminal behavior is *predatory* if it is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or a person with whom a relationship has been established or promoted for the primary purpose of victimization. [¶] Violation of Penal Code sections 288[, subdivision] (a)[,] and 288[, subdivision](b)[,] is a *sexually violent offense* when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the victim or another person of threatening to retaliate in the future against the victim or any other person. [¶] Violation of Penal Code sections 288[, subdivision] (a)[,]

12

and 288[, subdivision](b)[,] is also a sexually violent offense when the offense is committed on a child under 14 years old.  [¶]  As used here, *conviction* for committing a sexually violent offense is one of the following:  [¶]  a prior conviction for one of the offenses I have just described to you that resulted in a prison sentence for a fixed period of time.  [¶]  You may not conclude that . . . Sindaha is a[n] [SVP] based solely on his alleged prior convictions without additional evidence that he currently has such a diagnosed mental disorder.  [¶]  In order to prove that . . . Sindaha is a danger to the health and safety of others, the People do not need to prove a recent overt act committed while he was in custody.  A *recent overt act* is a criminal act that shows a likelihood that the actor may engage in sexually violent predatory criminal behavior."

The jury concluded Sindaha is an SVP.  The trial court ordered him committed to Coalinga for an indeterminate term.

DISCUSSION

*I. Sufficiency of the Evidence*

We need not provide a detailed explanation of the SVPA as the California Supreme Court has done that on numerous occasions.  (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646 (*Reilly*); *In re Lucas* (2012) 53 Cal.4th 839, 845; *People v. McKee* (2010) 47 Cal.4th 1172, 1183, 1185 (*McKee I*); *People v. Williams* (2003) 31 Cal.4th 757, 776 (*Williams*); *People v. Roberge* (2003) 29 Cal.4th 979, 981, 984 (*Roberge*); *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 243 (*Cooley*); *People v. Hurtado* (2002) 28 Cal.4th 1179, 1181-1182, 1186 (*Hurtado*); *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 893, 902 (*Ghilotti*); *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143 (*Hubbart*).)

Suffice it to say, the SVPA provides for indefinite involuntary civil commitment of certain offenders who are found to be SVPs following the completion of their prison terms.  (*McKee I, supra,* 47 Cal.4th at pp. 1186-1187.)  Except for nonsubstantive differences in grammar, California's SVP law tracks verbatim the

13

Kansas SVP law approved in *Kansas v. Crane* (2001) 534 U.S. 407, and *Kansas v. Hendricks* (1997) 521 U.S. 346. (*Hubbart, supra,* 19 Cal.4th at p. 1157.) Section 6600, subdivision (a)(1), states: "'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

To establish that a person is an SVP, the prosecution was required to prove the following: (1) the offender has been convicted of a qualifying sexually violent offense against at least two victims; (2) the offender has a diagnosed mental disorder; (3) the disorder makes it likely the offender would engage in sexually violent conduct if released; and (4) this sexually violent conduct will be predatory in nature. (*Roberge, supra,* 29 Cal.4th at pp. 984-985; *Cooley, supra,* 29 Cal.4th at pp. 243 & 246, fn. 9; *Hurtado, supra,* 28 Cal.4th at p. 1189.) The prosecutor must establish these elements beyond a reasonable doubt and the jury must be unanimous. (*Reilly, supra,* 57 Cal.4th at p. 648.)

"We review sufficiency of the evidence challenges under the SVP Act according to the same standard pertinent to criminal convictions. [Citation.] We thus review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the determination below. [Citation.] We may not determine the credibility of witnesses, nor reweigh any of the evidence, and we must draw all reasonable inferences in favor of the judgment below. [Citation.]" (*People v. Fulcher* (2006) 136 Cal.App.4th 41, 52.)

A defendant claiming insufficiency of the evidence forfeits the claim on appeal when he "restricts his analysis to the evidence most favorable to himself." (*People v. Battle* (2011) 198 Cal.App.4th 50, 62; see also *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282 (*Dougherty*).) The defendant must ""''state fully, with transcript references, the evidence which is claimed to be insufficient to support the

14

findings"'" (*Dougherty, supra,* 138 Cal.App.3d at p. 282), and the reviewing court is not required to "'comb the record on [defendant's] behalf.'" (*Ibid.*)

Needless to say, the outcome of this case depended entirely on which experts the jury believed. There are hundreds of pages of expert testimony in this case. Yet appellate counsel provides very little of that testimony. And when he does discuss the expert testimony, he cites almost entirely to that evidence which favors his client, which forfeits the issue. Nevertheless, we will address the merits of his claims.

A. *Diagnosed Mental Disorder*

Sindaha argues there was insufficient evidence he had a current diagnosed mental disorder based on the following: (1) there was no recent objective criteria he currently suffered from a diagnosed mental disorder that rendered him unable to control his behavior; (2) there was no evidence Joseph and David were prepubescent; (3) the qualifying sexual offenses were too remote to establish a current diagnosed mental disorder; and (4) expert testimony pedophilia is a chronic condition is insufficient to establish a current diagnosed mental disorder. His contentions are meritless.

Section 6600, subdivision (c), states, "'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) "Entirely aside from future dangerousness, the SVPA requires a diagnosed mental disorder *affecting the person's emotional or volitional capacity* that predisposes the person to commit sex crimes in a menacing degree. [Citation.] . . . [T]his requirement alone implies 'serious difficulty' in controlling behavior, as required by *Kansas v. Crane*[, *supra,* 534 U.S. 407]." (*Williams, supra,* 31 Cal.4th at p. 776; *Kansas v. Crane, supra,* 434 U.S. at pp. 412-413 [interpreting Kansas SVP law and serious mental disorder as requiring special and serious difficulty in controlling behavior].)

15

"A diagnosis of pedophilia requires a person to have recurrent, intense sexually arousing fantasies, sexual urges or behaviors involving sexual activity with a prepubescent child" for a period of at least six months. [Citations.]" (*People v. Dodd* (2005) 133 Cal.App.4th 1564, 1568; American Psychiatric Assn. Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) § 302.2, pp. 571-572 (DSM IV).)

Here, there was sufficient evidence from which the jury could reasonably conclude Sindaha suffered from a current mental disorder, pedophilia, that made it difficult for him to control his behavior. Both Murphy and Malinek diagnosed Sindaha with pedophilia. Murphy opined Sindaha was attracted to males of all ages, including prepubescent males. Murphy explained his two offenses 10 years apart indicate Sindaha has a deviant interest in prepubescent boys and it was not an isolated incident. Based on her complete review of his history, she concluded Sindaha has a long standing interest in children. Murphy said pedophilia is chronic and Sindaha did not understand why he molested Joseph and David and did not know how to prevent doing it in the future.

Malinek opined Sindaha meets the criteria for pedophilia based on his convictions and Sindaha's statements he was drawn to children. Malinek stated that during his 2012 interview, Sindaha said he did not feel comfortable having sexual relations with adults so he "'went younger.'" Sindaha admitted he was sexually attracted to Joseph and David. Malinek concluded Sindaha had pedophilic inclinations in part based on his perception Joseph was 10 years old. Malinek found it important Sindaha said he received beneficial treatment while in prison for molesting Joseph and when he was released he molested David. Malinek relied on this to conclude Sindaha failed to learn from his treatment and was unable to control his pedophilic urges. Malinek described pedophilia as "chronic and life-long." Based on this evidence, Sindaha's admissions he was attracted to young males, and expert testimony Sindaha's history demonstrates a long standing deviant interest in prepubescent boys, Sindaha failed to

16

understand his conduct, Sindaha failed to control his urges despite treatment, and pedophilia is chronic, the jury could reasonably conclude Sindaha had a current mental disorder, pedophilia. (*McKee I, supra,* 47 Cal.4th at p. 1192 [expert testimony critical in an SVP case because unlike criminal trial where trier of fact must determine whether defendant committed certain acts, SVP case involves prediction about individual's future behavior].) It is well established that "[t]he credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it. [Citations.]" (*People v. Flores* (2006) 144 Cal.App.4th 625, 633 [SVP case] (*Flores*).)

Sindaha relies on *People v. Buffington* (1999) 74 Cal.App.4th 1149 (*Buffington*), to argue there were no recent objective criteria he was a pedophile. He asserts there was no evidence that while at Coalinga he discussed having sex with children, admitted in therapy he had a sexual obsession with children, wrote stories or drew pictures depicting sex with children, possessed child pornography, ordered children's catalogues, or watched children's television or movies. He buttresses his claim with Murphy's concession on cross-examination the most recent evidence of pedophilia is Sindaha's molestation of David in 1994. Sindaha's reliance on *Buffington* is misplaced.

In *Buffington*, the court upheld the constitutionality of the SVPA in part by determining that it requires "'recent objective indicia of the defendant's condition'" as well as "'current psychological symptoms.'" (*Buffington, supra,* 74 Cal.App.4th at p. 1161.) The court opined those requirements are satisfied by the administrative process for screening and evaluation of SVPs, requiring professional assessments of the diagnoses and risk factors, which must be sufficient to demonstrate the required criteria for SVP commitment beyond a reasonable doubt. (*Ibid.*) The court noted the SVPA does not require a recent overt act to support a finding a defendant is likely to reoffend. (*Ibid.*; (§ 6600, subd. (d).)

17

Nothing in *Buffington* suggests expert testimony is insufficient to establish the requisite recent objective indicia of the defendant's condition, or current psychological symptoms. Additionally, while it is true a current mental disorder is required, a defendant need not currently be exhibiting symptoms or manifestations of the disorder. To hold otherwise would be absurd, as a defendant is constrained from acting on his urges in a secured state hospital. Moreover, as Sindaha admitted he is attracted to young males, which was in part the basis of Murphy's opinion his pedophilias was the non-exclusive type, it was certainly reasonable for the jury to conclude Sindaha satisfied his sexual urges in prison as evidenced by his relationships in Coalinga.

With respect to Sindaha's contention insufficient evidence supports the conclusion Joseph and David were prepubescent, we disagree. The DSM IV defines prepubescent as "generally age 13 years or younger." (DSM IV, *supra*, § 302.2, p. 571.) Murphy explained that "a value judgment" must be made when the victims are 11, 12, and 13 because they could be going through puberty. It is true David was 13 years old and Joseph was one month shy of his 13th birthday, but based on Sindaha's statements, both Murphy and Malinek opined David and Joseph were prepubescent. Sindaha told Murphy that he did not recall seeing any pubic hair or secondary sex characteristics on either victim. He also told her David was cute and short and Joseph was young. Additionally, Sindaha perceived one of the victims to be young. He told Malinek that he thought Joseph was 10 years old, and he tried to have sexual relations with adults, but he did not feel comfortable so he "'went younger.'" We agree with Sindaha this evidence is not overwhelming, but neither is it so speculative as to have no evidentiary value. (*Flores, supra,* 144 Cal.App.4th at p. 633 [appellate court cannot reexamine expert testimony].) The jury could reasonably rely on Sindaha's admissions and the expert's value judgments to conclude Joseph and David were prepubescent.

As to Sindaha's assertion the qualifying sexual offenses were too remote to establish he currently suffers from a mental disorder, we disagree. Section 6600,

18

subdivision (b), states the sexually violent offense may be committed "*on, before, or after the effective date of this article*." (Italics added.) The SVP law clearly states it "does not require proof of a recent overt act while the offender is in custody." (§ 6600, subd. (d).) Sindaha concedes his 1985 and 1995 convictions properly establish the qualifying prior sexual offenses, but he complains they are of little if any evidentiary value on the issue of his *current* mental state. Murphy and Malinek, however, did not rely solely on Sindaha's prior convictions in concluding he currently suffered from pedophilia. They also relied on Sindaha's statements and conduct, and the results of actuarial analysis. To the extent Sindaha asserts Murphy's and Malinek's opinions were too remote, we disagree as their evaluations were both less than one year before trial. Sindaha's reliance on *People v. Salomon Munoz* (2005) 129 Cal.App.4th 421, 428-432, is misplaced as that case involved the evidentiary value of two prior SVP commitments in a recommitment proceeding. Needless to say, that is not the procedural posture of this case. Additionally, his analogies to remoteness principles in Evidence Code section 1108 and conservatorship proceedings (§ 5000 et seq.), do not alter our conclusion. In sum, Murphy's and Malinek's conclusions Sindaha currently suffered from pedophilia were not based solely on his 1985 and 1995 convictions.

Finally, as we explain above, the record includes more than Murphy's and Malinek's testimony pedophilia is chronic. Their opinions were based on a totality of the circumstances, which included Sindaha's psychosexual history.

B. *Likely to Reoffend*

Sindaha contends there was insufficient evidence he will likely engage in sexually violent predatory conduct if released. We disagree.

"[T]he phrase '*likely* to engage in acts of sexual violence' . . . , as used in section 6601, subdivision (d), connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination

19

that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Ghilotti, supra,* 27 Cal.4th at p. 922; *Roberge, supra,* 29 Cal.4th at p. 986, *Cooley, supra,* 29 Cal.4th pp. 255-256.)

Here, there was sufficient evidence from which the jury could reasonably conclude there was a serious and well-founded risk Sindaha would likely engage in sexually violent predatory conduct if released. Both prosecution experts opined Sindaha was likely to reoffend. Murphy opined Sindaha was likely to reoffend if released because of the following: his chronic mental disorder, his qualifying offenses were predatory, his inability to control his urges and impulses as demonstrated by his repeated rules violations while in custody and parole violations, his treatment and failure to understand the basis for his conduct and failure to discuss it, his current sex drive, his failure to have a plan for relapse, and the actuarial risk assessments. As to the actuarial risk assessments, Murphy stated both tests revealed he was in the moderate high range for reoffending. Malinek based his opinion on most of the same considerations, including the qualifying offenses were predatory, inconsistent treatment while in custody, conduct in custody, normal sex drive, and the actuarial risk assessments. With respect to the actuarial risk assessments, Malinek opined Sindaha was a high risk of reoffending.

Moreover, there was evidence Sindaha's substance abuse contributed to his poor decision making. Sindaha was under the influence of drugs and alcohol at the time of both qualifying offenses. Sindaha testified his triggers were drugs and "teenage young men." The evidence at trial demonstrated Sindaha had been sober for at most one year. The jury could reasonably rely on this evidence to conclude Sindaha's substance abuse problems contributed to his failure to control his impulses and he had not achieved sufficient success in his sobriety. Contrary to Sindaha's repeated claims otherwise, this is

20

evidence that establishes his risk of reoffense is well-founded. Sindaha cites only to the evidence that supports his contentions, but as we explain above we must review the entire record.

Thus, based on Sindaha's admissions and conduct, and the expert testimony, the evidence supported the conclusion there was "much more than the mere possibility" of a well-founded risk Sindaha was likely to reoffend. Indeed, based on our complete reading of the record, the likelihood of reoffense was better than even.

Sindaha relies on isolated portions of Murphy's and Malinek's testimony to argue their opinions he was likely to reoffend was speculative and not well-founded. He cites to the following statements from Murphy: (1) "Clinical judgment is generally about the same as a coin toss. 50/50[;]" (2) actuarial risk assessments "help improve that predicted accuracy, but only improve it somewhat. More like 70 percent. [¶] So it's not perfect by any means[;]" (3) actuarial risk assessments do not "tell you that this individual is high risk to reoffend of this is their percentage likelihood[;]" and (4) comparisons of individuals to test groups is inexact, imperfect, and employs circular reasoning which results in a "Catch-22." Additionally, Sindaha relies on the following statements from Malinek: (1) the actuarial risk assessments are "gross screening measures[;]" and (2) comparisons of individuals to test groups is inexact. Finally, he cites to his own experts' testimony the actuarial risk assessments are statistically ineffectual in predicting future behavior.

As we explain above, Sindaha cites only to the evidence that supports his contentions and fails to provide a complete portrayal of the expert testimony at trial, which we provide above. We will not reexamine expert testimony. (*Flores, supra,* 144 Cal.App.4th at p. 633.) The jury heard and considered all the expert testimony and necessarily rejected Sindaha's theory he was not likely to reoffend. Expert testimony is critical in SVP cases because they involve predictions about an individual's future behavior. (*McKee I, supra,* 47 Cal.4th at p. 1192.) Second, the Static-99 test and other

21

actuarial risk assessments are commonly used and relied on in predicting the likeliness of reoffending. (See *People v. Paniagua* (2012) 209 Cal.App.4th 499, 504, fn. 5; Pen. Code, § 290.04.)

Finally, by their very nature, SVP proceedings involve some uncertainty because predicting human behavior is an inexact science. The California Supreme Court recognized this when it stated, "The word 'likely,' as used in the statute, also must be construed in light of the 'difficulties inherent in predicting human behavior' [citation], particularly in mathematical terms." (*Ghilotti, supra,* 27 Cal.4th at p. 921.) Sindaha complains the Attorney General confuses the quantum of evidence necessary to demonstrate the likelihood of reoffense with quality of the evidence supporting the expert opinion. Both Murphy and Malinek candidly testified to the limits of clinical judgments and actuarial risk assessments and stated they are tools to be considered in determining whether an individual is an SVP based on a totality of the circumstances. Neither said she/he relied solely on a clinical judgment or actuarial risk assessment in making her/his determination. Thus, sufficient evidence supports the conclusion there is a serious and well-founded risk Sindaha will likely engage in sexually violent predatory conduct if released.

II. *Void for Vagueness*

Sindaha asserts the SVPA is unconstitutionally vague because the statutory standard "leaves the application of the statute to the individual predilections of" evaluators, attorneys, judges, and jurors. He adds that a risk that is substantial, serious, and well-founded can mean different things to different people. Sindaha's claim is an attack on the California Supreme Court's definition of "likely" first articulated in *Ghilotti, supra,* 27 Cal.4th at page 922, at the prefiling stage, then in *Cooley, supra,* 29 Cal.4th at pages 255-258, at the probable cause stage, and then in *Roberge, supra,* 29 Cal.4th at pages 987-988, at the trial stage. As the California Supreme Court has interpreted "likely" in the same manner in a trio of cases, we reject Sindaha's claim it is

constitutionally suspect.  (*In re Marquez* (2003) 30 Cal.4th 14, 20 [courts interpret statute consistent with applicable constitutional provisions seeking to harmonize statute and constitution].)  Moreover, the term "likely" has been approved in statutes which are substantially similar to the SVPA, such as the Kansas sex offender statute reviewed in *Kansas v. Hendricks, supra,* 521 U.S. 346.  Because the likelihood standard under the SVPA is not materially different from the statute at issue in *Kansas v. Hendricks, supra,* 521 U.S. 346, and the California Supreme Court has clearly and repeatedly spoken on the issue, we reject Sindaha's void for vagueness claim.

*III.  Jury Instructions*

*A.  Likely*

Citing to the California Supreme Court's definition of "likely" articulated in *Ghilotti*, *Cooley*, and *Roberge*, Sindaha argues the trial court erred in failing to instruct the jury sua sponte on the complete definition set forth in those cases.  We disagree.

As we explain above, "the phrase '*likely* to engage in acts of sexual violence' . . . , as used in section 6601, subdivision (d), connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control.  On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*.  Instead, an evaluator applying this standard must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*Ghilotti, supra,* 27 Cal.4th at p. 922; *Roberge, supra,* 29 Cal.4th at p. 986, *Cooley, supra,* 29 Cal.4th pp. 255-256.)

As relevant here, the trial court instructed the jury with CALCRIM No. 3454, as follows:  "A person *is likely to engage in sexually violent predatory criminal behavior* if there is a substantial danger, that is, a serious and

23

well-founded risk that the person will engage in such conduct if released into the community.  [¶]  The likelihood that the person will engage in such conduct does not have to be greater than

50 percent."

Sindaha asserts the trial court erred in failing to instruct the jury sua sponte on the "outside lower limit" that "likely" means "more than the mere possibility."  He claims the court should have modified CALCRIM No. 3454 to include the following language:  "Likely to engage in acts of sexual violence connotes much more than the mere possibility that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control[,]" or something similar.  (Italics omitted.)

"The rules governing a trial court's obligation to give jury instructions without request by either party are well established.  'Even in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.'  [Citations.]  That obligation comes into play when a statutory term 'does not have a plain, unambiguous meaning,' has a 'particular and restricted meaning' [citation], or has a technical meaning peculiar to the law or an area of law [citation].  [¶]  As is clear from our recent decision in *Ghilotti, supra,* 27 Cal.4th 888, the meaning of the SVPA's term 'likely' is neither plain nor unambiguous."  (*Roberge, supra,* 29 Cal.4th at p. 988.)

Here, the trial court instructed the jury that to find Sindaha was an SVP, there had to be a "substantial danger" and a "serious and well-founded risk," that he would reoffend if released.  The instruction as given closely tracked the language in *Roberge, supra,* 29 Cal.4th at page 988, where the court stated that "a person is 'likely [to] engage in sexually violent criminal behavior' if at trial the person is found to present a *substantial danger*, that is, a *serious and well-founded risk*, of committing such crimes if released from custody."  No reasonable juror would have read the trial court's instruction to conclude a "mere possibility" of reoffending would suffice to qualify

24

Sindaha as an SVP. Thus, the instruction was accurate as given, although in the future the better practice would be to instruct the jury with the language Sindaha complains was improperly omitted to track precisely the definition of "likely" articulated in *Ghilotti*, *Cooley*, and *Roberge*.

B. *Recent Overt Act*

Sindaha argues the trial court erred in refusing his request to instruct the jury with a pinpoint instruction informing the jury it could consider the absence of a recent overt act in reaching its verdict because it was a correct statement of the law and was not otherwise covered. Not so.

"A trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case, but it need not give an argumentative or duplicative instruction. [Citation.]" (*People v. Harris* (2013) 57 Cal.4th 804, 853.) The same rule applies in civil cases. "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) We will review the trial court's determination de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

Here, the trial court properly refused to instruct the jury with Sindaha's pinpoint instruction telling the jury it could consider the absence of evidence of an overt act in reaching its verdict. As relevant here, an individual is a sexually violent predator if the individual has a "diagnosed mental disorder that makes the person a danger to the health and safety of others." (§ 6600, subd. (a)(1).) Section 6600, subdivision (d), provides, "'Danger to the health and safety of others' does not require proof of a recent overt act while the offender is in custody." The trial court instructed the jury with CALCRIM No. 3454 on this point as follows: "In order to prove that . . . Sindaha is a

25

danger to the health and safety of others, the People do not need to prove a recent overt act committed while he was in custody. A *recent overt act* is a criminal act that shows a likelihood that the actor may engage in sexually violent predatory criminal behavior." The instruction tracked the statutory language and was proper. (*Williams, supra,* 31 Cal.4th at pp. 774-775 [CALCRIM No. 3454 tracks statutory language and is sufficient].) Moreover, we conclude the pinpoint instruction was argumentative because it unduly emphasized a particular issue, the absence of a recent overt act, and invaded the jury's province by inviting the jury to draw inferences favorable to Sindaha. Such an instruction is improper. (*People v. Mincey* (1992) 2 Cal.4th 408, 437 [court must refuse argumentative instruction that invited jury to draw favorable inferences to one party from specified evidence].)

Sindaha argues his pinpoint instruction remedied a flaw in CALCRIM No. 3454. He claims the language that relieves the prosecution from the requirement of proving a recent overt act also relieves the prosecution from proving he suffers from current symptoms establishing a current mental disorder. We disagree. CALCRIM No. 219 informed the jury Sindaha was presumed not to be an SVP and the prosecution must prove Sindaha was an SVP beyond a reasonable doubt or the jury must find the petition not true. Additionally, CALCRIM No. 3454 required the prosecution to prove Sindaha "has a diagnosed mental disorder." In making that determination, the court instructed the jury it could not conclude Sindaha was an SVP based solely on his prior convictions "without additional evidence that he currently has such a diagnosed mental disorder." Based on the entire charge to the jury, we conclude the court properly instructed the jury on the prosecution's burden of proof, i.e., that Sindaha has a current mental disorder. Thus, the court did not err in refusing Sindaha's pinpoint instruction on the absence of a recent overt act.

*C. Mental Disorder*

Sindaha raises two claims regarding the mental disorder requirement. First, he claims the trial court erred in refusing to instruct the jury with his pinpoint instruction stating he must suffer from a mental disorder that distinguished him from a typical recidivist. Relying on *People v. Leffel* (1988) 203 Cal.App.3d 575 (*Leffel*), he claims that because of witness testimony and the prosecutor's statements the court had a sua sponte duty to instruct the jury that it needed to find he had serious difficulty controlling his sexually violent behavior. *Williams, supra,* 31 Cal.4th 757, is dispositive.

In that case, the trial court did not separately and specifically instruct the jury on the need to find serious difficulty in controlling behavior, and defendant argued a separate "'control'" instruction was constitutionally required under *Kansas v. Crane, supra,* 534 U.S. 407. (*Williams, supra,* 31 Cal.4th at p. 759.) After exhaustively discussing the United States Supreme Court's decisions in *Kansas v. Crane, supra,* 534 U.S. 407, and *Kansas v. Hendricks, supra,* 521 U.S. 346, and its own decision in *Hubbart, supra,* 19 Cal.4th 1138, the *Williams* court concluded the SVPA "inherently *embraces and conveys* the need for a dangerous mental condition characterized by impairment of behavioral control," and "states *no* category of committable disorder which *does not expressly require* a dangerous effect on emotional or volitional capacity." (*Williams, supra,* 31 Cal.4th at p. 774.) Thus, it concluded, "a jury instructed in the language of [the SVPA] must necessarily understand the need for serious difficulty in controlling behavior," and no "further lack-of-control instructions or findings are necessary to support a commitment under the SVPA." (*Williams, supra,* 31 Cal.4th at pp. 774-775.)

Here, the trial court instructed the jury with CALCRIM No. 3454, which tracks the statutory language the *Williams* court concluded was sufficient. We are bound by *Williams* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and therefore reject Sindaha's claim of instructional error.

We also reject Sindaha's assertion witness testimony and the prosecutor's statements takes the case outside *Williams'* holding because they were misleading and relieved the prosecution from proving beyond a reasonable doubt Sindaha had serious difficulty controlling his sexually violent behavior.  As we explain above, the trial court properly instructed the jury with CALCRIM No. 3454, and with CALCRIM No. 200, which informed the jury the trial court was the final arbiter of what the law is and if anything counsel said conflicts with what the law is, the jury must follow the court's instructions.  Finally, neither *Leffel, supra,* 203 Cal.App.3d 575, a Fifth District Court of Appeal case concerning the meaning of "gross negligence," nor the cases it relied on, convince us to depart from the California Supreme Court's reasoning in *Williams, supra,* 31 Cal.4th 757.

*D.  Amenability to Treatment*

Relying on *People v. Grassini* (2003) 113 Cal.App.4th 765 (*Grassini*), Sindaha contends the trial court had a sua sponte duty to instruct the jury it should consider whether his amenability to treatment raised a reasonable doubt as to whether he was likely to reoffend.  We disagree.

In determining whether it is likely that the person will reoffend, the question is whether the individual presents a serious and well-founded risk of committing sexually violent criminal acts that will be of a predatory nature if the person is set free in the community.  (*Roberge, supra,* 29 Cal.4th at pp. 988-989.)  "Evidence of the person's amenability to voluntary treatment, if any is presented, is relevant to the ultimate determination whether the person is likely to engage in sexually violent predatory crimes if released from custody."  (*Id.* at p. 988, fn. 2.)  The trial court in an SVP proceeding must instruct on the general principles of law that are necessary to the jury's understanding of the case.  (*Id.* at p. 988.)

In *Grassini, supra,* 113 Cal.App.4th at page 777, footnote omitted, the court ruled that "the presence of [evidence of amenability to voluntary treatment] creates

28

a sua sponte duty in the trial court to instruct the jury that it is to determine whether custody in a secure facility is necessary to ensure that the individual is not a danger to the health and safety of others." Based on *Grassini*, CALCRIM No. 3454 includes a fourth element that must be proved to establish SVP status if there is evidence of the person's amenability to voluntary treatment, that it is necessary to keep the person "'in custody in a secure facility'" to ensure the health and safety of the public. (*People v. Superior Court* (*George*) (2008) 164 Cal.App.4th 183, 194-195.)

Here, the trial court instructed the jury with this fourth element as follows: "It is necessary to keep him in custody in a secure facility to ensure the health and safety of others." Sindaha acknowledges this language "parallels" *Grassini* but argues CALCRIM No. 3454 "completely fail[s] to address the issue that triggers the instruction[,]" i.e., "whether [his] amenability to voluntary treatment raised a reasonable doubt as to whether [he] was likely to reoffend." Because the instruction was a correct statement of the law, the trial court did not have a sua sponte duty to instruct the jury on this point further. Had Sindaha wanted a special instruction on this point, he could have requested one. He did not, and the trial court properly instructed the jury with CALCRIM No. 3454's fourth element as required by *Grassini*.

E. *Burden of Proof*

Again focusing on the fourth element, Sindaha claims the trial court instructed the jury in language that placed the burden of proof on dangerousness on him. Again, the fourth element stated, "It is necessary to keep him in custody in a secure facility *to ensure the health and safety of others*." (Italics added.) Sindaha relies on the italicized portion of the statute to argue the instruction shifted the burden of proof to him because "if the jury has no evidence of anything that would guarantee the health and safety of others then the jury has no choice but to answer that confinement in a secure facility is necessary. In that sense, on this element, the burden of proof has been reversed." His claim is meritless.

29

"'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] . . . [Citation.] "'"Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.'"' [Citation.]" (*People v. Hajek* (2014) 58 Cal.4th 1144, 1220.)

Nothing in CALCRIM No. 3454's fourth element, CALCRIM No. 3454, or the instructions as a whole placed the burden of proof on Sindaha. As to the fourth element, it merely told the jury to consider whether custody in a secure facility was necessary to protect the health and safety of others. The remainder of the instruction and other instructions clearly placed the burden of proof on the prosecution. CALCRIM No. 3454 begins, "The petition alleges that . . . Sindaha is a sexually violent predator. [¶] To prove this allegation, the People must prove beyond a reasonable doubt that . . . ." The court also instructed the jury with CALCRIM No. 219, which stated in relevant part, "The Petitioner is required to prove the allegations of the petition true beyond a reasonable doubt." Based upon the court's entire charge, we conclude the prosecution properly bore the burden of proof to prove all allegations beyond a reasonable doubt. Therefore, the fourth element of CALCRIM No. 3454 did not shift the burden of proof to Sindaha to prove he was not dangerous.

IV. *Admission of Evidence*

Sindaha claims the trial court made two evidentiary errors. We will address each in turn.

A. *Parole*

Relying on *Krah, supra,* 114 Cal.App.4th 534, Sindaha asserts the trial court erred in admitting evidence he would not be on parole if released. Not so.

In *Krah, supra,* 114 Cal.App.4th at page 539, a petition was filed alleging defendant was an SVP and should be committed to a state hospital. Defendant contended

30

he was not an SVP due to his advanced age and poor health, making it unlikely he would reoffend if released into the community. (*Ibid*.) On appeal, defendant argued the trial court committed reversible error by excluding evidence of the terms and conditions of parole that would have been imposed on him if he were released from custody. (*Id.* at p. 544.)

The *Krah* court disagreed, explaining: "[Defendant's] theory of relevance reflects a fundamental misunderstanding of section 6600[, subdivision](a)(1). This statutory provision directs the trier of fact to determine whether the defendant has a '*diagnosed mental disorder*' that predisposes him to engage in sexually violent criminal behavior. Evidence of the terms and conditions of a parole release is simply not relevant to the determination whether the defendant has the type of medical condition that is an element of the definition of a sexually violent predator. Further, admitting such evidence might well confuse and mislead a jury. For example, a jury presented with such evidence might mistakenly base its determination on an assessment of the likely effectiveness of the policing function of the prospective parole officer rather than on the relevant evidence pertaining to the defendant's actual mental condition." (*Krah, supra,* 114 Cal.App.4th at pp. 544-545.) *Krah* is inapposite.

Here, the trial court properly admitted evidence on the issue of parole because it was relevant to the issue of whether Sindaha should be kept in a secure facility. Unlike *Krah*, the record includes no evidence concerning parole *terms and conditions*. The only evidence Sindaha cites to, and the only evidence we could find, concerning parole is Murphy's and Sindaha's testimony he would not be on parole if released. Again, the evidence was limited to the fact he would not be on parole and necessarily not on terms and conditions of parole. The court properly admitted evidence of Sindaha's parole status.

31

*B. Sexually Violent Predator*

Sindaha claims use of the phrase "sexually violent predator" was inherently inflammatory and prejudicial, and thus deprived him of due process. The same attorney who represents Sindaha in this appeal raised the identical claim in at least five nonpublished cases (*People v. Atualevao* (Feb. 13, 2013, A131853) [nonpub. opn.]; *People v. Aguon* (Jan. 17, 2013, D053875) [nonpub. opn.]; *People v. Yartz* (Sept. 30, 2011, C064044) [nonpub. opn.]; *People v. Martinez* (Dec. 16, 2010, D055274) [nonpub. opn.]; *People v. Lowe* (Nov. 29, 2010, A124874) [nonpub. opn.]). Those courts rejected this argument. On the court's own motion, we take judicial notice of the opinions in those cases. (Evid. Code § 451, subd. (a); *In re Luke L.* (1996) 44 Cal.App.4th 670, 674, fn. 3 [judicial notice of nonpublished opinion pursuant to Evid. Code, § 451, subd. (a) ].)

We need not engage in a lengthy discussion as to why his claim is meritless. Suffice it to say, the Legislature chose the phrase "sexually violent predator" when enacting the SVPA, and CALCRIM No. 3454 similarly uses that phrase. Sindaha's remedy is to petition the Legislature to amended section 6600 et seq. to omit any reference to "sexually violent predator." Sindaha's claim the prosecutor committed misconduct by using the phrase is meritless as the prosecutor simply used the words specified in the statutory scheme. Finally, the prejudice contemplated when assessing the prejudicial effect of evidence is that evidence which causes the jury to prejudge a person. We conclude there is no likelihood the jury prejudged Sindaha because as we explain above the trial court properly explained the prosecution was required to prove all the required elements beyond a reasonable doubt. Thus, the court properly denied Sindaha's motion to preclude the prosecutor from using the phrase "sexually violent predator."

*V. Cumulative Error*

Sindaha contends the cumulative effect of the errors requires reversal. We have concluded there were no errors. Thus, his claim has no merit.

*VI. Equal Protection*

*A. Burden of Proof*

Sindaha contends the SVPA violates his equal protection rights because the SVPA places a higher burden of proof on SVPs than similarly situated mentally disordered offenders (MDOs) and individuals committed after being found not guilty by reason of insanity whose commitments are extended (NGIs). He adds the matter must be remanded to the trial court for a hearing to determine whether there is a justification for placing a higher burden of proof on SVPs than on MDOs and NDIs. Again, we disagree.

In *McKee I, supra,* 47 Cal.4th at pages 1202, 1207, the California Supreme Court recognized that persons civilly committed as MDOs or NGIs are subject to short, definite terms of commitment whereas persons found to be SVPs are committed to an indeterminate term of commitment. The court concluded SVPs were similarly situated to these other groups of committees. (*Id*. at pp. 1204, 1207.) It remanded the matter to the trial court "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id*. at pp. 1208-1209, fn. omitted.)

After remand, the superior court conducted a 21-day evidentiary hearing on the justification of disparate treatment for SVPs and concluded the People had met their burden. On appeal, the Fourth District, Division One reviewed the matter de novo. (*People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*).) "When a constitutional right, such as the right to liberty from involuntary confinement, is at stake, the usual judicial deference to legislative findings gives way to an exercise of independent judgment of the facts to ascertain whether the legislative body '"has drawn reasonable inferences based on substantial evidence."'" (*McKee I, supra,* 47 Cal.4th at p. 1206.)

33

In *McKee II*, the court concluded "[t]he People have shown 'that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] . . . that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children'; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate . . . that the disparate treatment of SVP's under the amended [SVPA] is necessary to further the state's compelling interests in public safety and humanely treating the mentally disordered." (*McKee II, supra,* 207 Cal.App.4th at p. 1347.) The Supreme Court denied a petition for review, making *McKee II* final. (*McKee II*, review den. Oct. 10, 2012, S204503.)

Sindaha recognizes this court has followed *McKee II, supra,* 207 Cal.App.4th 1325, in *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1377 (*McDonald*), and *People v. Landau* (2013) 214 Cal.App.4th 1, 47-48 (*Landau*). But he argues this court should reconsider its acceptance of *McKee II*. We decline his invitation and follow the well-reasoned analysis in *McDonald* and *Landau*. We find the reasoning in *McKee II* persuasive and Sindaha offers no compelling justification for departing from it.

B. *Summary Dismissals*

Sindaha also contends section 6608 violates his equal protection rights because the trial court may summarily dismiss a frivolous petition without a hearing when similar petitions from MDOs and NGIs are not subject to summary dismissal. He adds the matter must be remanded to the trial court for a hearing to determine whether there is a justification for the disparate treatment.

The Attorney General responds Sindaha's claim is not ripe for review because he has not filed a section 6608 petition, a petition for conditional release after having been committed as an SVP. Sindaha responds the claim is equally ripe with the equal protection challenge considered by the California Supreme Court in *McKee I, supra,* 47 Cal.4th 1172. We agree with the Attorney General.

It is a "well-settled rule that courts should 'avoid advisory opinions on abstract propositions of law. [Citations.]' [Citation.]" (*People v. Ybarra* (1988) 206 Cal.App.3d 546, 549; *People v. Gonzales* (1994) 29 Cal.App.4th 1684, 1700.) To prevent advisory opinions, courts must wait until a case "'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.'" (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171.)

Under section 6608, if an SVP files a petition for conditional release or unconditional discharge without the recommendation or concurrence of the Director of State Hospitals, the court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (§ 6608, subd. (a).) Here, Sindaha's appeal is from the jury's verdict under the SVPA's initial commitment procedures (§§ 6601-6604), and not from a determination under the postcommitment release procedure set forth in section 6608.

We recognize that in *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1086-1088 (*McCloud*), the First District remanded an appeal from an SVP commitment determination "so that both parties may fully brief and argue [defendant's] claim that section 6608, subdivision (a), violates the equal protection clause" because his claim was not "wholly without merit." (*McCloud, supra,* 213 Cal.App.4th at p. 1088.) The issue of ripeness was not before the court in that case however. Thus, we conclude Sindaha's equal protection challenge is not ripe.

35

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


IKOLA, J.