[No. F047476. Fifth Dist. Nov. 1, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD FLORES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

Counsel

Hayes H. Gable III, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stan Cross and Julie A. Hokans, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

WISEMAN, J.—After serving prison terms and an initial commitment to Atascadero State Hospital, defendant Edward Flores was recommitted to the state hospital after a jury found that he continued to be a sexually violent predator within the meaning of the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.). He claims that, in light of the fact that he voluntarily underwent chemical and surgical castration while confined, the jury's future-dangerousness finding was not supported by substantial evidence. He also contends that the trial court erred when it modified a pattern jury instruction regarding future dangerousness. In the published part of this opinion, we conclude that the evidence was sufficient. In the unpublished part, we hold that there was no instructional error.

## *FACTUAL AND PROCEDURAL HISTORIES*

In 1997, defendant was committed to the state hospital as a sexually violent predator for a two-year term pursuant to Welfare and Institutions Code section 6604.[1] The record on appeal does not indicate the factual basis for this original commitment, but the law requires a finding that the offender is a sexually violent predator, which in turn requires convictions of two or more sexually violent offenses and a diagnosed mental disorder making it likely that the offender will engage in sexually violent criminal behavior in the future. (§§ 6600, subd. (a)(1), 6604.) Defendant admitted the allegations in the petition when the district attorney sought his commitment in 1997 and admitted them again when a two-year extension of his commitment was sought in 1999. According to expert testimony given in this case, defendant self-reported sexual offenses against 15 to 18 victims.

---

[1] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise noted.

In 2001, when the first two-year extension of defendant's commitment was set to expire, the district attorney filed a petition for another two-year extension. This time, defendant contested the petition. In 2002, before the petition was heard, defendant voluntarily underwent castration surgery, also known as an orchiectomy. Defendant had undergone chemical castration earlier.

The second extension petition still not having been heard by 2003, the district attorney filed a petition for a third extension. This was considered together with the 2001 petition at a probable-cause hearing held pursuant to section 6602. The court found probable cause to believe the petitions were true and consolidated them for trial. The matter was tried to a jury, resulting in a mistrial in May 2003.

A second jury trial was conducted on the consolidated petitions in 2005. Three experts testified on behalf of the People. Each gave a diagnosis of pedophilia and concluded that defendant was a sexually violent predator and likely to reoffend within the meaning of the law.

These conclusions were based in part on defendant's long history of committing sex offenses, which began when he was 13 or 14 years old. (He is 46 now.) At 13 or 14, defendant began fondling his younger stepsisters, leading ultimately to a juvenile hall commitment when he was 16. In 1979, when he was 19, he began a relationship with a 14-year-old girl. The two lived together until 1985 and had two children together. Other offenses took place during the same period. In 1981, defendant was convicted of contributing to the delinquency of a minor when he allowed his robe to come open in front of a seven-year-old girl. Defendant was convicted in 1984 of annoying or molesting a minor after he posed as a potential buyer of a house in order to induce a girl living there to sit on his lap. At some time between 1982 and 1986, defendant had an ongoing sexual relationship with one of his stepsisters, then aged 13 to 17. An incest charge was dropped as part of a plea bargain.

Defendant was convicted by guilty plea in 1986 of two counts of lewd and lascivious acts upon a child under 14 (Pen. Code, § 288) and sentenced to eight years in prison. The victims were an eight-year-old girl and a seven-year-old boy. He was paroled in 1990 but arrested 11 days later for a parole violation after being accused of repeatedly having his eight-year-old daughter pull her pants down. He was briefly incarcerated for the violation. Later the same year, while still on parole, defendant molested a seven-year-old girl and

then left the state with a 13-year-old girl, living with her for a time under several aliases and fathering a child with her. In 1995 or 1996, he was convicted of molesting the seven-year-old and sentenced to three years in prison.

Asked how he reached his conclusions about defendant's predisposition to commit sex offenses, one of the People's experts gave this testimony characterizing defendant's history: "Essentially I considered Mr. Flores' life-long history of sexual offending, and specifically his sexual offending behavior that relates to his sexual attraction to children and his compulsion to engage in this behavior despite the fact that he's suffered numerous consequences for doing so, such as being sent to prison and being put on parole and being supervised in the community. All of these things that have happened to him as a result of his behavior have not stopped him. In fact, even after being released on parole, only for 11 days in one case, he went out and started engaging in this behavior again. So there is a compulsion to his behavior, a feeling like he had to engage in this behavior, and it's a life long history of it."

The People's experts also relied on an "actuarial instrument" known as the Static 99. One expert explained the function of actuarial instruments: "The actuarial approach is based on an approach similar to, let's say, what an insurance company would use. So an insurance company knows that if somebody has had three prior accidents, they're more likely to get in another accident than somebody who has never been in an accident before. Similarly, somebody who's been convicted of three prior sex offenses is much more likely to commit a sex offense in the future than someone who has never been convicted of a sex offense or has been convicted of one sex offense."

The Static 99 is based on data from over 31,000 sex offenders and takes account of prior sex offenses, prior non-sex offenses, whether or not the victims are the offender's relatives, and a variety of other factors. According to the People's experts, it is "the most widely used actuarial instrument for assessing sexual reoffense risk" and is "moderately predictive of sexual reoffense . . . ." Acknowledging the limits of its accuracy, one of the People's experts said yes when asked if the Static 99 is only "about as accurate as guessing a person's weight" when "the only thing you know about that person is how tall they are."

Each of the People's experts gave defendant a score of six or greater on the Static 99. For persons with a score of six or more, the Static 99 predicts a 52 percent likelihood of reoffending within 15 years.

The Static 99 accounts only for static factors, which are unchanging facts about the offender. Being castrated postoffense is a dynamic factor, so a Static 99-based prediction does not account for it. The People's experts, however, believed defendant's likelihood of reoffending remained high despite his castration. One stated that, although the risk of sexual recidivism was lower because of the castration, it was "still above the threshold that is represented by the term, 'likely.' " He stated that in taking this view of castration, he agreed with "most people [who] do this kind of work," and was in "the middle," between smaller groups that believe castration either has "absolutely no effect" or is "a cure all."

The People's experts discussed two reasons why defendant's risk of reoffending remained high despite his castration. First, physical gratification was not defendant's only motivation in committing sex offenses: "The motivation for his sexual offending was not purely sexual. It had a sexual component. By being sexual with these kids, he felt more intimate with them, felt closer to them, he felt connected. He had a—a benefit for this behavior that was not purely sexually motivated. So taking away testosterone does not completely get rid of the motivation." Where sexual gratification is not the motivation, a lack of sexual functioning does not deter offenses, for defendant could commit them using only his hands, for example. A man does not need to have an erection to molest a child.

Second, castration "does not completely get rid of sexual functioning as much as people generally think or believe." Some testosterone is produced in the adrenal gland rather than the testicles. At least some castrated men can have erections and function sexually if they are healthy, and defendant himself reported some postcastration erections.

The People's experts considered several other factors in addition to defendant's offense history, Static 99 score, and castration. Among the other factors about which they testified were defendant's good behavior, willing participation in treatment, and progress in treatment at Atascadero; his level of motivation to rehabilitate himself as evidenced by the request for castration; his good employment history, history of good behavior in prison, and relatively advanced age; whether his victims were relatives or not; whether he engaged in antisocial behavior other than sex offenses; the fact that he had an additional diagnosis of narcissistic personality disorder; and his troubled childhood.

Four expert witnesses testified on behalf of defendant. Three opined that after his castration surgery, defendant did not satisfy the criteria for commitment as a sexually violent predator. The fourth had no opinion.

One of defendant's experts asserted that the Static 99 had not been accepted by the scientific community and had "[a]ll kinds of problems"; he also stated his general disapproval of psychologists' predictions of behavior. Two of defendant's other experts testified that the Static 99 should not be used to predict the behavior of offenders who underwent postoffense castrations. One of these stated that the Static 99 is "basically worthless" in predicting the behavior of a castrated offender; the other said "you throw the Static 99 out the window" if the offender has been castrated. One of these experts also testified that castration is highly effective in treatment of high-risk sex offenders, agreeing with the statement that it is "the gold standard of treatment in the prevention of sexual recidivism," and claiming that most experts in the field "would say that physical or chemical castration is highly effective in reducing recidivism." The same witness saw defendant as an exceptional case because of the castration and because of his desire for continued treatment: ". . . I don't disagree that most people shouldn't be released from Atascadero. But when someone does something that has a demonstrable and drastic effect in lowering their risk, I think they should be released. In addition, he wishes to continue to be monitored in the community. . . . I would hate to see him deprived of that opportunity to actually be monitored in the community, and given help finding, you know, medications to treat the side effects, and, you know, just a whole bunch of benefits that I think he had merited very highly."

Defendant's fourth expert testified about the results of testing defendant with an instrument called the penile plethysmograph or PPG, which measures changes in the circumference of a subject's penis as he views images of adults and children and of consensual and nonconsensual sex acts or listens to audiotapes describing various sexual scenarios. The witness stated that, while defendant exhibited "deviant arousal" and "deviant interest" before the castration, he became a "non-responder" to all types of images after.

The jury found that defendant was a sexually violent predator. The court committed him to the state hospital for two years.[2]

## DISCUSSION

### I. Sufficiency of the evidence

Defendant argues that, in light of his castration, there was insufficient evidence to satisfy the statutory criteria for commitment as a sexually violent

---

[2] The court's order stated that this period was to expire May 12, 2003, almost two years before the order was filed. As defendant points out in his brief, this appears to be a mistake, since the trial was upon both the 2001 petition and the 2003 petition. Also, the court stated during the trial that if the petition was found true, the commitment would end May 12, 2005. The parties have not requested that we direct the trial court to modify the order.

predator. More specifically, he contends that the evidence could not establish that he would likely reoffend if released. "When an appellant asserts there is insufficient evidence to support the judgment, our review is circumscribed. [Citation.] We review the whole record most favorably to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298 [69 Cal.Rptr.2d 148].) We conclude that the evidence presented was sufficient to prove the petition beyond a reasonable doubt.

■ A person may be civilly committed as a sexually violent predator under the SVPA upon proof beyond a reasonable doubt that the person (a) has been convicted of two predicate sex offenses as defined in the statute, and (b) "has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1); see § 6604.) The jury "must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger*, that is, a *serious and well-founded risk*, that he or she will commit such crimes if free in the community." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949].) This standard requires "much more than the mere *possibility* that the person will reoffend," but it does not call for "a precise determination that the chance of reoffense is *better than even*." (*Ibid.*)

Defendant does not challenge the findings that he had two predicate convictions or that he had a diagnosed mental disorder. He claims only that, in light of his surgical castration, the evidence was not sufficient to show a serious and well-founded risk of reoffense. He focuses especially on the Static 99, his experts' opinions that this instrument is not meaningful when applied to a castrated offender, and the People's experts' concession that the Static 99 results did not take account of dynamic factors, including castration.

■ The conflict among the experts' opinions on the utility of the Static 99 in this context did not render the evidence insufficient. While conceding that castration is not a factor the Static 99 accounts for, the People's experts opined that the Static 99 still supported their conclusions because castration left intact much of defendant's motivation and ability to commit sex offenses. In finding that defendant satisfied the criteria for continued confinement, the

jury necessarily rejected his experts' contention that his castration made him not likely to reoffend. ■ The credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it. (*People v. Poe* (1999) 74 Cal.App.4th 826, 831 [88 Cal.Rptr.2d 437]; *People v. Mercer* (1999) 70 Cal.App.4th 463, 466–467 [82 Cal.Rptr.2d 723].)

Defendant argues, however, that the evidence presented by all the experts showed that "there is no proven method of combining the risk as measured by the [Static 99] with the decrease in reoffense rate occasioned by castration . . . ." In saying this, he implies that the People's experts behaved irrationally when they cited the Static 99 results while at the same time admitting that castration reduced defendant's risk to an unquantifiable extent; consequently their testimony on these matters could not be relied on by a reasonable finder of fact.

The People's experts did not need to know by precisely what percent castration reduced the risk before they could meaningfully say the reduction was not enough to make the Static 99 results meaningless. They offered an informed judgment of the relative weight of castration in relation to the Static 99 factors and other factors and concluded that castration did not tip the balance. They pointed out to the jury that the Static 99 was one consideration, castration another, defendant's specific offense history another, and so on; they never claimed to be able to combine all the factors in a single numerical projection of the chances of reoffense. There was nothing wrong in principle with that way of proceeding.

Apart from this dispute over the relationship between the Static 99 results and the effects of castration, there is no doubt that the evidence was sufficient to support the judgment. In addition to the Static 99 and the effects of castration, the People's experts considered defendant's lengthy offense history and several other factors, as just discussed. This was "evidence that is reasonable, credible, and of solid value" (*In re Jerry M., supra,* 59 Cal.App.4th at p. 298) from which the jury could find a serious and well-founded risk of reoffense.

II.  *Jury instruction**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 625.

## *DISPOSITION*

The judgment is affirmed.

Harris, Acting P. J., and Cornell, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 21, 2007, S148688.