Filed 3/18/25  P. v. Littlejohn-Zabel CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLES GENE LITTLEJOHN-ZABEL, JR.,<br><br>Defendant and Appellant. | F086520<br><br>(Super. Ct. No. CRP53759)<br><br>**OPINION** |

APPEAL from an order of commitment of the Superior Court of Tuolumne County.  Douglas Boyack, Judge.  (Retired Judge of the Tuolumne Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Charlotte Woodfork, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Charles Gene Littlejohn-Zabel, Jr., appeals an order of commitment the trial court entered pursuant to Welfare and Institutions Code section 6600 et seq.,[1] the Sexually Violent Predators Act (SVPA). He contends there is insufficient evidence to support the court's finding that he suffers from a mental disorder that impairs his ability to control violent sexual impulses and renders him a danger to the health and safety of others if released from custody. Specifically, defendant argues that the evidence does not show that he currently suffers from a mental disorder and evidence of his past inability to control his sexually violent behavior is insufficient to show he is currently unable to control his sexually violent behavior. We disagree and affirm the order of commitment.

## PROCEDURAL BACKGROUND

Defendant pleaded guilty to committing a lewd act upon a child in violation of Penal Code section 288, subdivision (a) after being charged by the District Attorney of Tuolumne County on March 7, 2012. The trial court sentenced him to a term of six years in prison on July 9, 2012.

On July 12, 2017, the District Attorney of Tuolumne County filed a petition to commit defendant as a sexually violent predator (SVP) under the SVPA. Both parties waived their right to a jury trial. Following a bench trial on May 12, 2023, the court found defendant to be an SVP, granted the petition for commitment, and ordered him committed to the State Department of State Hospitals for an indeterminate term.

Defendant filed a timely notice of appeal on July 7, 2023.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2.

# FACTS

## I.    *Defendant's conduct.*[2]

### A.    Qualifying Offense (2012 Offense of Conviction)

Defendant's father and the father's girlfriend lived together while at times, the girlfriend's five-year-old grandson (victim 1) either lived with them or visited. On February 17, 2012, defendant was on probation for a nonqualifying sexual offense committed when he was a juvenile (described more fully below), and his probation officer visited defendant's residence. The probation officer found defendant with victim 1, but both defendant and victim 1 denied that anything had occurred between them. Later, victim 1 advised that defendant had touched his penis the day that the probation officer found them together. When questioned by law enforcement, defendant admitted that he had touched victim 1's penis for defendant's arousal.

Victim 1 later told the social worker that he lived with defendant and, the day of the incident, he and defendant were playing tag. They went to a wood building where defendant pulled down victim 1's pants and underwear despite victim 1 telling defendant not to do so. Defendant touched victim 1's penis with his hand. Victim 1 threatened to tell what had happened, but defendant told him not to do so. Defendant pulled up victim 1's pants upon hearing the probation officer arrive.

When questioned by police, defendant advised that he had been playing tag with victim 1, and they went into another building on the property where they talked about victim 1's dream about zombies. Defendant admitted that he touched victim 1's penis and became sexually aroused. He lied to his probation officer about what had happened.

During clinical interviews with Dr. Yanofsky and Dr. Flinton in 2017, defendant explained that he had known victim 1 since he was a baby and resided with him.

---

[2]    Our description of these events is taken from records from defendant's juvenile wardship proceedings and the various expert reports of Dr. Charles Flinton and Dr. Bruce Yanofsky that were admitted into evidence upon stipulation of the parties during defendant's bench trial.

Defendant described victim 1 as the little brother that he never had. Discussing what transpired with victim 1, defendant told Dr. Yanofsky that he did not understand what had happened, and that he was alone and confused. Defendant said that he was close to victim 1, and his closeness with victim 1 "[took] the place of friends." Defendant stated that he did not believe that he was aroused by children and explained that he had been watching pornography that was highly sexualized, but he had no outlet and was sexually deprived and believed that to be the cause of his actions. Defendant claimed that he had changed and was no longer addicted to pornography.

In 2019, defendant told Dr. Flinton that he did not believe that victim 1 understood what was happening, but that defendant was motivated by curiosity. He was insensitive and blinded by his need for intimacy. He told Dr. Flinton that he was confused at the time and access to victim 1 was convenient. While initially admitting that he was attracted to victim 1, defendant later corrected himself and stated that he was attracted to the act itself and thought victim 1's age would prevent discovery of the abuse. In 2020 and 2021, defendant made statements to Dr. Flinton indicating he was more aware of the effect his conduct had on victim 1. In 2022, defendant advised that victim 1 had tried to kill himself.

**B.     Other Unadjudicated Sexual Offenses**

*(1)     Prior molestation of victim 1 in 2012 offense*

When questioned about victim 1 in the 2012 offense, defendant said that he had previously pulled down victim 1's pants when he was three years old and when defendant was 15 or 16 years old. Defendant and victim 1 were behind a shed on their property, and defendant asked victim 1 to see his penis. After victim 1 pulled down his pants, defendant pulled down his own pants and asked victim 1 to touch defendant's penis. Victim 1 did so. The probation report in defendant's 2012 case indicates that this was reported to law enforcement on September 9, 2009. The district attorney declined to file a juvenile petition based upon this offense because victim 1 was three years old and not

4.

able to qualify as a witness. Defendant told Dr. Yanofsky that he committed the offense because he did not have a girlfriend and had anger issues about being rejected "all the time."

### (2) December 7, 2009 reported offense

On December 7, 2009, law enforcement received a report that defendant touched three young boys aged six, seven, and eight years. Regarding the December 7, 2009 incident, defendant initially denied any other inappropriate sexual behavior in his 2017 interview with Dr. Flinton until the doctor specifically asked about this incident. Defendant then claimed that the three boys approached him and asked defendant to expose his penis, but the charges were dismissed because the boys were not credible. In 2018, defendant admitted to Dr. Flinton that defendant had asked the boys to expose themselves to him.

### (3) Juvenile petition (2011)

On June 14, 2011, when defendant was 17 years old, he visited the home of a nine-year-old boy (victim 2) and played video games in victim 2's room for approximately 45 minutes as other adults gathered elsewhere. The following day, victim 2's father learned that victim 2 had reported that defendant asked victim 2 to see victim 2's penis. Victim 2 told his parents that defendant had suggested that they both undress and show each other their penises. A juvenile wardship petition pursuant to section 602, subdivision (a) alleged a violation of Penal Code section 647.6, subdivision (a)(1), misdemeanor child molestation. Defendant admitted the violation and later admitted to the probation officer that his conduct was wrong and stupid, he did not know what he was thinking, he needed counseling, and he would do anything to avoid jail. Defendant was declared a ward of the court and ordered to participate in a sex offender treatment program. He was on probation for this offense when he committed the 2012 qualifying offense described above.

When asked about the 2011 incident by Dr. Flinton in 2017, defendant claimed that his behavior was influenced by pornography, he was viewing excessive amounts of pornography, and his "motives got out of hand." Because he viewed so much pornography, masturbation was not a sufficient release and he went outside to look for sexual stimulation.[3] He saw victim 2, a neighbor boy whom he had not seen before, and asked victim 2 if defendant could touch victim 2's genitals. Victim 2 declined and defendant showed victim 2 his own penis in an attempt to get victim 2 to do so. Defendant denied that he targeted victim 2 and explained that he would have exposed himself to anyone who was present: "It could've been anyone. It would've been better if it was a woman." Defendant denied that he was homosexual. Defendant told Dr. Flinton that he reoffended because his sexual offender treatment was unsuccessful. He denied being attracted to kids and was hypersexual at the time. Defendant really wanted to be in a sexual relationship with a female, but he had been rejected and was unsuccessful in meeting a woman using a telephone hotline. Because he wanted physical contact, he randomly targeted victim 2 and, when victim 2 resisted defendant's advances, defendant exposed his own penis in an attempt to entice victim 2 to sexually engage with him.

During a 2020 interview with Dr. Yanofsky, defendant wanted to clarify the description of the 2011 juvenile offense and stated that he had been convicted of indecent exposure, defendant had only verbally enticed victim 2 to touch defendant, but victim 2 declined to touch defendant. Dr. Yanofsky noted that defendant had, in fact, been convicted of child molesting based upon this incident. Describing the offense to Dr. Yanofsky, defendant claimed, "I was deprived in my mental state, I was not explained properly of how I was supposed to be." He said, "How was I supposed to cope with

---

[3] Defendant's description of the incident differed from descriptions in documents reviewed by Dr. Flinton.

6.

things was not explained." He said that he had become heavily involved in pornography and "thought about what I wanted as an adult but I was a kid."

Defendant told Dr. Yanofsky that his girlfriend dropped him in eighth grade, he had no one with whom he could discuss his feelings, he "grew into a state of overzealousness," and he became involved in "chronic masturbation." He had to stop masturbating when he developed friction wounds from doing so approximately 10 times a day. He committed the crime because he felt that he had no other options for releasing his sexual feelings. However, he could not explain what he was thinking at the time of the 2011 offense, he met victim 2 that day, and the incident only involved enticement to touch defendant. Defendant claimed that he was not attracted to victim 2 but had an erection because of the "idea of being touched."

## C. Defendant's Description of His Sexual History

Defendant told Dr. Flinton in 2017 that a 13-year-old girl forced him to have sexual intercourse when he was nine years old. Defendant claimed that he was being treated at the time of the interview for genital warts that he contracted as a result of this sexual encounter. In elementary school, other children picked on him, and he believes that his medication for attention deficit disorder made it difficult for him to connect with other children. Defendant was also picked on by others when he was a teenager. Defendant had one female friend whom he dated in seventh and eighth grades, but she ended the relationship because he made sexual advances toward her and wanted her to touch his penis. He obsessed over this breakup for the rest of his teenage years.

By the time defendant was 15 years old, he was viewing two hours of internet pornography every other day but was becoming bored and desensitized by viewing the primarily heterosexual material. Defendant told Dr. Flinton in 2017 that he was attracted only to females and not to males or children. He denied viewing any pornography in prison and denied any sexual contact while in custody. When confronted with his rule violation for possessing pornography, defendant claimed that it was a one-time event.

7.

In 2019, defendant told Dr. Flinton that he drew pictures of adult females who were sometimes nude and sexy in the style of anime. Anime is sometimes viewed by individuals with pedophilia as a substitute for child pornography. He denied masturbating while fantasizing about boys and claimed an attraction to Asian women with large breasts. Defendant continued to deny any attraction to children in 2020 and 2021 interviews with Dr. Flinton. In 2022, defendant told Dr. Flinton that he masturbated to fantasies involving fictional or anime characters and animated female caricatures.

In 2020, defendant told Dr. Yanofsky that the offenses took place due to chronic masturbation, viewing too much pornography, and lying to himself that it was okay. He targeted young boys because they were "easier to exploit" and no other gender was around. His girlfriend had dumped him, and he was unsuccessful in dating. He was awkward in social settings and harassed at school and by neighbors. He believed that if girls had been available, he would have offended as to them as well. Defendant believed he masturbated because he was watching adult pornography involving girls. When Dr. Yanofsky asked whether he still found enjoyment from his activities with boys, defendant stated that he did and he regretted it because he did not realize at the time the damage that he inflicted on himself and the victims. He advised Dr. Yanofsky that he believed the treatment he was receiving had helped him to understand his behavior and he had no interest in "doing this again, ever."

During Dr. Yanofsky's interview with defendant in October 2022, defendant advised that he was still early in his treatment. When asked about any new understandings regarding his offenses, defendant stated that he had been under a self-induced lie and had given himself permission to do what he did, explaining that he was a social outcast in high school and depressed. He chose young children because he was afraid of rejection, and the victims were male because it was convenient. Defendant claimed that he did not intend to abuse the victims, but his hormones took over.

Defendant could not provide an answer as to whether he selected children as his victims solely due to his inability to find an age-appropriate partner.

In 2022, defendant reported to Dr. Yanofsky that he was not masturbating due to having a circumcision surgery two months previously but when he did do so, he fantasized of normal sex with adult women. However, defendant had previously taken a penile plethysmograph (PPG) physiological test which indicated he became aroused to minors. Defendant denied that he was attracted to children and could not explain the test results.

### D.    Defendant's Treatment Progress

Defendant initially refused to participate in sexual offender treatment in 2018 pursuant to the advice of legal counsel. However, by 2019, defendant had completed module I of the sexual offender treatment plan. An annual psychiatric evaluation, dated August 12, 2020, indicated that defendant had not made any progress as to boundaries and minimal progress with self-regulation of his sexual arousal. His treatment plan reflected that he had been tested and evidenced deviant arousal.

During a 2021 interview with Dr. Flinton, defendant indicated that he was working on common life goals, his offense progression chain, and his life plan. He appeared invested in his treatment, but not clear about how he had changed, and he did not have a relapse prevention plan. Dr. Flinton consulted with defendant's doctor in November 2022 and was advised that defendant denied any deviant sexual thoughts and was not masturbating as much because genital warts made it painful for him to do so. Defendant was generally cooperative with assignments but did not always complete them on time. He needed prompting to participate in treatment because he was tired from having stayed up late watching movies or playing video games. Defendant explained to Dr. Yanofsky that he did not "prioritize" sleeping and had been late to the evaluation interview because staff had to wake him for it. Defendant said that he stayed up late to play video games or watch movies.

In 2022, defendant was working on module II of the sexual offender treatment program, but the treatment was slow due to the need for defendant to complete paperwork concerning his life goals, offense progression chain, and personal history. Defendant admitted that part of the problem was caused by his inability to manage his time and devote time to treatment. Treatment facilitators noted that defendant did not complete his thoughts and fantasy journals as requested.

According to the treatment provider, defendant continued to exhibit an unwillingness to acknowledge deviant sexual interests and insisted that his child victims were merely a matter of convenience. Because defendant could not speak of this topic without becoming emotional, he was asked to document his thoughts and fantasies, but he refused to do so and claimed that he had no such thoughts at all. Eventually, defendant discussed this area but continued to claim that he selected children because it was convenient and easier to "get in" sexually with a child. He also admitted that he was attracted to his victims' "innocence and youthful looks" and did not believe that he would be caught. Defendant was conflicted because his victims were male and suggested he might be bisexual before reiterating that he was heterosexual. The treatment provider described defendant's progress as very slow. Additionally, defendant viewed pornography depicting Disney characters and Hentai and played video games, indicating that defendant still identified with children.

## II. Expert opinions.

### A. Dr. Charles Flinton, Forensic Psychologist

Dr. Flinton testified that he had been working with sex offenders since about 1988, was licensed in 1999, and commenced SVP evaluations in 1998, for which he received annual training since being assigned to a panel by the State Department of State Hospitals in 2006. Additionally, Dr. Flinton had served on the California Sex Offender Management Board for three to four years, a board that develops protocols from doctors who provide recommendations regarding sexual offenders. He performed approximately

10.

700 to 800 evaluations of SVPs, performed 2,500 to 3,000 sexual offender evaluations overall, worked for both the defense and the state, and had testified as an expert approximately 70 times.

To qualify as an SVP, defendant must have been convicted of a qualifying sexual offense, possess a mental disorder that predisposes him to future sexual offenses, and pose a serious and well-founded risk for committing future sexual offenses. Dr. Flinton met with and performed evaluations of defendant in 2017, 2019, 2020, 2021, and 2022. Dr. Flinton's overall impression of defendant was that he has a volitional impairment that creates confusion when he makes mistakes and prevents him from using the experience to change his future behavior.

Dr. Flinton testified regarding the several incidents which affected his diagnosis in addition to the offense of conviction, including defendant's sexual abuse of victim 1 when victim 1 was three years old, defendant's juvenile adjudication in 2011 for molesting victim 2, a nine-year-old boy who was six years younger than defendant, and defendant's exposure of his penis to three boys, all of whom were more than five years younger than him. Dr. Flinton also described defendant's most recent offense that occurred when he was 18 years old, involving victim 1, the five-year-old grandchild of defendant's father's girlfriend who sometimes resided with defendant. At the time, defendant was on probation from an earlier offense, yet he continued to engage in sexually inappropriate behavior even though he was under a fair amount of supervision. Defendant pulled down victim 1's pants despite victim 1's resistance and only stopped because defendant's probation officer arrived.

This most recent conviction for violation of Penal Code section 288, subdivision (a) was a qualifying violent sexual offense because victim 1 was less than 14 years old. Defendant's four separate sexual offenses involving children establish a pattern between 2009 and 2012 wherein defendant targeted prepubescent males, and Dr. Flinton diagnosed defendant with pedophiliac disorder based upon the criteria in the

11.

fifth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (published in 2013) (DSM-5).  Pedophilia refers to a condition where someone has a pattern of sexual fantasies, urges, or behaviors directed toward prepubescent children.[4]  Pedophiliac disorder is an enduring, long-lasting, and life-long condition and is not curable.  Dr. Flinton noted in one report that defendant's sexual behavior was intense and persistent.  Because defendant had also indicated an attraction to females, Dr. Flinton qualified his diagnosis as nonexclusive.

Though defendant may not have been acting out because he did not have access to children since 2012, while incarcerated, defendant drew Disney and anime characters, evidencing that he still emotionally identifies with children.  Additionally, while at the state hospital, defendant was tested using a PPG that is administered by placing a gauge on the subject's penis while providing the subject with visual and audio stimuli, which then measures the arousal corresponding to the stimuli.  Defendant's test demonstrated an arousal to prepubescent stimuli, that is, a deviant arousal toward children which matched his earlier behavior to prepubescent boys.

Additionally, defendant's medical history included a diagnosis of autism spectrum disorder, and Dr. Flinton observed behaviors of defendant during interviews that evidenced symptoms of the disorder.  This condition would inhibit defendant's ability to profit from experience and change his behavior, thus limiting his capacity to make long-term changes.  As a result of defendant's conditions, he demonstrates emotional impairment in that he does not truly understand the impact of his conduct on his victims and volitional impairment in that he was unable to control his behavior even after being arrested, treated, and placed on probation.

---

[4]    Diagnosis for this disorder requires that (1) defendant have had recurrent intents, fantasies, urges, or behaviors involving sexual activity with prepubescent children over a period of at least six months, (2) acted on these sexual urges or that they caused marked distress or interpersonal difficulty, and (3) defendant was at least 16 years of age and five years older than the child victim.

The state hospital protocol for evaluations requires the evaluator to use both an actuarial risk assessment tool and a dynamic risk assessment tool. For the actuarial risk assessment tool, Dr. Flinton administered the Static-99R that measures the potential to commit any type of sex offense, not necessarily a sexually violent offense. Defendant scored a six that placed him in a well-above average category, as people who score a six reoffend at about 17.6 percent over five years and 25 percent over 10 years.[5] For the dynamic risk assessment tool, Dr. Flinton administered the STABLE-2007 that considers other factors which can potentially reduce the risk of reoffence over time and concluded that defendant was in the "above average need" category. Dr. Flinton identified defendant's impulsivity, limited ability to develop intimate social relationships, and identification with children as factors that need to be addressed in treatment before he could be released. Dr. Flinton testified that defendant's risk of reoffence would be predatory in nature because defendant had developed relationships with his child victims specifically to sexually exploit them. He concluded that because defendant is still in the early stages of treatment, he requires high levels of supervision in a custodial setting until he completes treatment and meets the criteria to qualify as an SVP.

B.     **Dr. Bruce Yanofsky**

Dr. Bruce Yanofsky is a clinical and forensic psychologist and has been on the state's SVP panel since 2003. He has conducted approximately 935 such evaluations and testified as an SVP expert approximately 100 times. Dr. Yanofsky first evaluated defendant in 2017, conducted additional yearly evaluations, and prepared yearly updated reports.

Dr. Yanofsky testified that defendant suffers from pedophiliac disorder, a diagnosable mental disorder that predisposes him to the commission of sexual offenses.

---

[5]     Dr. Flinton's 2022 report also described that defendant scored 10 on the Static-2002R instrument and has a 53.5 percent five-year risk of sexual reoffending.

13.

In reaching this diagnosis initially, Dr. Yanofsky used the same criteria as Dr. Flinton from the DSM-5, except for his final report in which he used the DSM-5-TR (published in 2022), the newest revised version of the DSM-5, but which did not change his diagnosis.

In his report, Dr. Yanofsky diagnosed defendant with "Pedophilic Disorder, sexually attracted to both males and females, non-exclusive" because he had sexually molested prepubescent boys over a two-or three-year period. Defendant's past pattern of deviant arousal, commission of offenses after receiving sex offender treatment, and commission of the underlying offense that he was serving a term of juvenile probation for indicate a condition that predisposes him to commit sexual crimes against children. More recently, defendant was tested and showed arousal with prepubescent males and females.

Dr. Yanofsky testified that defendant developed a sexual interest in children and acted on it when he was a juvenile, then reoffended when he was 16 years old, but escalated his conduct even after being placed on probation and offered treatment. Defendant's volitional impairment is demonstrated by his failure to control himself even after being sanctioned for his behavior and through defendant's own description of himself as hypersexual and masturbating excessively, which injured his penis. Dr. Yanofsky also concluded that defendant's previous unsuccessful treatment while a juvenile and his escalated sexual activity thereafter demonstrates that defendant requires a higher degree of treatment that would not be provided by outpatient treatment and requires defendant's continued custody.

Like Dr. Flinton, Dr. Yanofsky used the Static-99R to assess defendant's risk of reoffending and placed him in the highest risk category based on a score of six. Using an additional testing instrument, the Structured Risk Assessment-Forensic Version (SRA-FV),[6] Dr. Yanofsky assessed defendant's dynamic risk factors and scored them at 4.16,

---

[6]     The reporter's transcript appears to erroneously refer to this test as the "SRAFB," but Dr. Yanofsky's report indicates that he used the SRA-FV. The SRA-FV is used to select a

which placed defendant in the "high risk norms" category. Dr. Yanofsky also used the STABLE-2007 to assess the variables applicable to defendant and inform his assessment of defendant's dynamic risk factors. In his report, Dr. Yanofsky explained that individuals with similar risk factors to defendant had a 25.5 percent risk of sexually reoffending within five years and a 37.3 percent risk of reoffending within 10 years. Additionally, Dr. Yanofsky noted in his report that several dynamic risk factors exist which defendant had not yet addressed in treatment, such as social influences, intimacy deficits, loneliness, social rejection, lack of concern for others, and sexual self-regulation. Because defendant's past offending was predatory in nature, he concluded that defendant's risk of future sexual offending would also be predatory.

Dr. Yanofsky's evaluation of defendant concluded that he had not applied himself fully to treatment and, unless receiving treatment in custody, would not pursue treatment in an outpatient capacity. Providing an example, Dr. Yanofsky testified that defendant stayed up late watching movies or playing video games, which caused him to be late for work, for his treatment appointments, and in completing his treatment assignments.

Dr. Yanofsky testified that defendant said he turned to children because he had been rejected by his girlfriend and others and "was attracted to [his victims'] innocence and youthful looks" and their ready availability and accessibility. Defendant denied a sexual interest in children despite this past criminal history and the results of his PPG test, which prevented him from advancing in his treatment. As recently as 2022, defendant exhibited a lack of insight into the causes of his sexual offenses, which affects his ability to control his behavior and prevent offending in the future. Additionally, defendant denied any sexual fantasies but then claimed he fantasied about adult women.

---

reference group for placing the Static-99R risk score in context. (*People v. Johnson* (2015) 235 Cal.App.4th 80, 86–87.)

He was not cooperative in recording his fantasies for treatment and was believed to be less than truthful regarding his sexual interests.

Dr. Yanofsky's report concluded that defendant suffers from a mental condition and has a high risk of reoffending given that he has not progressed in treatment for factors that created the risk. Defendant's paraphilic desires previously prevailed despite treatment and sanction by the justice system, and defendant denies his deviant urges but requires treatment to develop adequate strategies to manage his pedophilic urges. Defendant's mental condition predisposes him to commit sexual crimes and affects his volitional control, thus defendant represents a serious risk of sexually reoffending such to require civil commitment.

### C.      Dr. Brian Abbott

Dr. Brian Abbott is a licensed clinical psychologist and a licensed clinical social worker who first started evaluating sexual offenders in approximately 1978. Dr. Abbott had conducted approximately 700 SVP evaluations since 2002, although exclusively for the defense and after two doctors from the state panel concluded that the person qualified as an SVP. Dr. Abbott disagreed with the conclusion in all but 35 cases.

Dr. Abbott first evaluated defendant in two separate interviews on July 22 and July 27, 2020. He administered an objective personality test to assess defendant for a variety of disorders from the Diagnostic and Statistical Manual of Mental Disorders (such as depression, anxiety, bipolar disorder, & personality disorders) and the Abel Assessment for Sexual Interest (ABEL). Dr. Abbott conducted an updated interview in April 2023.

In determining whether defendant met the commitment criteria to qualify as an SVP, Dr. Abbott examined whether defendant exhibited any "sexual offense analog behaviors" while in custody, defined as ways in which defendant manifested sexual deviance toward children when he had no access to them while in custody (such as viewing child pornography or sexualized images of children). After reviewing defendant's records, Dr. Abbott concluded that defendant did not exhibit any analogue

16.

behaviors, which is inconsistent with the diagnosis of pedophiliac disorder or a conclusion that defendant cannot control his behavior even if suffering from the disorder.

Addressing defendant's 2019 PPG test results, Dr. Abbott testified that the test demonstrated an undifferentiated sexual response to females and males of all ages, but did not demonstrate that defendant had a clear-cut sexual preference for either children or adults. Because the results of the test failed to identify a pattern of response to children, defendant did not meet the criteria of pedophiliac disorder, which requires evidence of a sexual preference. Additionally, the results of the ABEL test demonstrated no clinically significant interest in prepubescent males or females. Even though the PPG test, ABEL test, and a visual reaction test demonstrated that defendant was sexually aroused by prepubescent children, that alone is not sufficient to diagnose defendant with pedophiliac disorder.

Dr. Abbott also completed a Violence Risk Scale-Sexual Offense Version dynamic factor test designed to analyze the effectiveness of defendant's treatment. After determining that defendant's Static-99R score was six and his pretreatment dynamic risk factors score of 24 was in the middle range, Dr. Abbott evaluated defendant's treatment score after treatment commenced in 2019 and the degree in which the score changed. Concluding that defendant's score lowered nine points, he computed defendant's risk of reoffence as 7.4 percent, a 60 percent reduction from the Static-99R risk of 17.6 percent.

Dr. Abbott also disagreed that defendant suffers from autism spectrum disorder. Dr. Abbott testified that defendant does not suffer from a condition that affects his emotional capacity or predisposes him to commit sexual acts to a degree that makes him a menace to the health and safety of others. However, even if he does, the 11 years prior to offending fails to evidence any current inability to control himself.

### D. Rebuttal to Dr. Abbott's Testimony

Dr. Flinton testified that Dr. Abbott underestimated defendant's risk of recidivism based upon older research and that the risk of sexual reoffending was 17.6 percent over

five years, 25 percent over 10 years, and 31.2 percent over 20 years. Additionally, Dr. Abbott relied upon an outdated version of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, which discussed an individual having a sexual preference wherein the current diagnosis requires that the individual have a strong interest. Five child victims over a period of several years demonstrates a strong interest in prepubescent males. Furthermore, the individual need not have an exclusive interest in children to be diagnosed with pedophiliac disorder. Sexual attraction to children is a fixed sexual interest and attraction that is lifelong. In defendant's case, he still exhibited being aroused by children during the PPG testing.

Dr. Flinton testified that defendant's denial of his attraction to children indicates that his thinking and insight is different from his physiological arousal. In defendant's case, he demonstrated volitional impairment by acting on his sexual attraction to children and continued offense behavior despite his first arrest. Defendant's most recent offense was committed even though he offended during a time when there was a high risk of being caught by adults present on the property at the time.

In addressing Dr. Abbott's repudiation of any effect of autism on defendant's risk of reoffending, Dr. Flinton testified that defendant needs specialized treatment in managing his sexual misconduct because people with autism spectrum disorder are not comfortable often in social interactions and may feel more comfortable with children. Dr. Flinton testified that defendant has a sexual interest or arousal pattern involving children, established by both his admissions and through PPG testing, and an emotional identification with children. Although it had been 11 years since defendant's last offense, this period of time cannot be used to conclude that defendant will not act out again because he did not have access to children during the 11 years.

Dr. Yanofsky testified and agreed that defendant's clinical presentation included elements of autism spectrum disorder, although the scope of his evaluation prevented him from offering a final diagnosis. Dr. Yanofsky also rejected Dr. Abbott's assertion that

18.

research and literature do not support any intersection between autism and sexual offending.

Dr. Yanofsky rejected Dr. Abbott's assertion that the DSM-5 and DSM-5-TR criteria for pedophiliac disorder requires a preference for prepubescent children. The DSM-5 and DSM-5-TR define the disorder with reference to the individual having sexual thoughts, fantasies, or behaviors that are recurrent and last at least six months. The description of the disorder does not require a preference for children as opposed to other individuals, as is evidenced by the qualifier of whether the interest is exclusive or nonexclusive.

Defense counsel questioned Dr. Yanofsky as to what conduct defendant engaged in while incarcerated evidenced that he would be an SVP if released. Dr. Yanofsky testified that because defendant is not exposed to his target population while in prison, Dr. Yanofsky "would not expect someone with [defendant]'s profile to act out in a way that would suggest that he's going to act out against children while he's in custody among adults." However, defendant's drawings and predilections for Disney and child-like materials provides some indication of defendant's thoughts. Recent behavior to support Dr. Yanofsky's opinion that defendant would reoffend includes defendant's discussion of his attraction to children; his identification with children reflected in his interest in anime, Disney, and cartoon characters; his lack of understanding of his own sexual interest; and his belief that he would not reoffend with children in the future. Some individuals offend against children because they feel an emotional connection or affinity with children, and these offenders present as more immature with an interest in material that belongs to younger generations or groups, such as Disney's Snow White. If an individual has offended against children because they find children easy targets and emotionally appealing, then an interest in these materials that usually appeal to a younger group is problematic and significant because it lines up with the sexual intention and emotional connectivity of the individual.

19.

Dr. Yanofsky explained that defendant currently has a qualifying condition that presents a danger to the community, even though defendant has not reoffended while in custody. Because of the substantial risk of danger defendant poses to the health and safety of others, he requires a custodial and secure environment while receiving treatment.

## III. Defendant's testimony.

Defendant testified that he did reoffend after having been in custody for two months after his juvenile adjudication and despite having been in counseling for eight months thereafter. Even after this counseling, defendant did not understand the effect his offenses had on the victims and the community.

Defendant admitted that he was disciplined in prison for possession of three photographs of naked adult women and later for removing food from the canteen. While in the custody of the state hospital, defendant violated the rules by jumping down a flight of stairs and possessing a microSD card that contained images of anime that defendant was transferring from one patient to another. Although defendant claimed that he never viewed the card's contents, he attempted to destroy it when discovered so that he would not have to answer questions concerning the other individuals involved.

Defendant testified that he initially refused sexual offender treatment at the hospital pursuant to his attorney's advice but became involved in treatment approximately one year later.

When questioned concerning the results of his PPG test, defendant testified that he felt an arousal response to the stimuli that he could not control and was upset with himself because he had not been attracted to minors during the test. Defendant claimed that he is only attracted to adult women, but as a teenager he could not find a girl with whom to have sex despite attempts to find a girlfriend at school, engage the services of a prostitute, and contact a telephone sex service. However, defendant admitted that he did

20.

become aroused when he molested the five-year-old victim involved in his most conviction.

Defendant testified that he would never molest a child again because he now realizes the harm that it causes. Although he knew that molesting children was wrong when he did it, defendant did not understand why it was wrong. Acknowledging that he had previously promised not to molest a child after his juvenile adjudication, defendant did not keep his word because he did not understand the damage that he caused to the victims.

Defendant admitted that he committed the offense involved in his juvenile conviction but testified that he had become aroused watching adults at the residence making out and fooling around and, in response, he showed his penis to the nine-year-old boy (victim 2). When questioned by the prosecutor, defendant admitted that he had become aroused from his encounter. After testifying to the facts of his most recent conviction, defendant explained that he is attracted to women and selected boys because he did not fully understand his sexuality. He testified that although he had been alone several times with victim 1, the five-year-old boy involved in defendant's most recent conviction, defendant had molested victim 1 only twice. Defendant also testified that he did not target the child victims, and they were spur of the moment choices. He realized that he had no "right going near them in that kind of fashion" and would never do so again.

Defendant explained that his lack of progress in treatment was because there were several people in the group meetings and he was not able to present his assignments, not due to his failure to complete his assignments. Defendant is absolutely willing to participate in treatment should he be released.

## DISCUSSION

### I. *Substantial evidence supports the trial court's determination that defendant is an SVP.*

#### A. Applicable Law and Standard of Review

The SVPA permits committing convicted sex offenders who have served their prison terms to a state mental hospital if they are found to be SVPs. (§ 6604.) A person is an SVP if they (1) have "been convicted of a sexually violent offense against one or more victims," (2) have "a diagnosed mental disorder that makes [them] a danger to the health and safety of others," and (3) are "likely" to "engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1); see also *People v. Yates* (2018) 25 Cal.App.5th 474, 477.)

A person is likely to engage in sexually violent criminal behavior if "because of [their] diagnosed mental disorder, [they] currently present[] a *substantial* danger—that is, a *serious and well-founded risk*—of criminal sexual violence." (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 895 (*Ghilotti*).) Evidence of sexually violent behavior occurring while the offender is in custody is not required. (§ 6600, subd. (d); *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1090.)

We review the sufficiency of the evidence in SVPA cases under the same substantial evidence test used in criminal appeals. (*People v. Orey* (2021) 63 Cal.App.5th 529, 560; *People v. Flores* (2006) 144 Cal.App.4th 625, 632.) "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant [is an SVP] beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We cannot reweigh the facts or the credibility of the witnesses. (*People v. Snow* (2003) 30 Cal.4th 43, 67.) "The testimony of just one witness is enough" to support the judgment, "so long as that testimony is not inherently incredible." (*In re Daniel G.* (2004) 120 Cal.App.4th

824, 830.) "Reversal for insufficiency of the evidence is warranted only if it appears that ' "upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment]." ' " (*Orey*, at p. 561.)

### B.   Analysis

Dr. Flinton and Dr. Yanofsky each testified that defendant suffers from pedophiliac disorder, which impairs his volitional and emotional capacity, and he is likely to commit sexual predatory acts if released. Defendant nevertheless asserts that because these doctors testified only that defendant's past sexual offenses were at least 11 or 12 years old, their opinions were based exclusively on his past conduct. Since the SVPA requires proof that an offender currently suffers from a mental condition that impairs his volitional control, defendant claims there is insufficient evidence to support a finding that he is an SVP.

The parties agree that defendant's 2012 offense of conviction, a violation of Penal Code section 288, subdivision (a), meets the first element to commit a person as an SVP. Both experts agreed as to the second and third elements of an SVP, that is, that defendant suffers from pedophiliac disorder and that he is likely to commit sexual predatory acts if released because the condition impairs his volitional capacity. The trial court accepted the opinion of these experts. The court discounted the testimony of Dr. Abbott, defendant's expert, that defendant does not have a mental disorder and, even if he does, the disorder does not affect his volitional or emotional capacity such that he is not a danger because Dr. Abbott relied on outdated research and studies that were not accepted in the broader scientific community.

Defendant acknowledges that the disagreement between experts cannot be the basis for concluding that the court's decision is not supported by substantial evidence. Defendant nevertheless asserts that it was not reasonable for the court to credit their testimony because these doctors relied only on crimes and molestations that were approximately 12 and 14 years old, and their opinions were based exclusively on his past

conduct. Since the SVPA requires proof that an offender currently suffers from a mental condition that impairs his volitional or emotional control, defendant claims there is a lack of evidence to support a finding that he is an SVP.

Dr. Yanofsky and Dr. Flinton properly relied, in part, upon the facts of defendant's offenses between 2009 and 2012 in forming their opinions. (See § 6600, subd. (a)(3) [conviction of past sex offenses is evidence supporting an SVP determination, though may not be the sole evidence]; *People v. Sumahit* (2005) 128 Cal.App.4th 347, 353 (*Sumahit*) [SVP "assessment must include consideration of [the defendant's] past behavior, his attitude toward treatment and other risk factors applicable to the facts of his case"].) But the experts' diagnoses and opinions were not based solely on defendant's past offenses, contrary to defendant's argument.

Both experts reviewed documents created since defendant's 2012 offense (including commitment evaluations, hospital records that identify defendant's behavior, treatment progress, probation reports, hospital staff notes, and court records) and consulted with staff treating defendant for each yearly evaluation between 2017 and 2022. Each doctor compiled a complete criminal and social history for defendant and applied the Static–99R test, which utilizes 10 factors to assess the risk that sex offenders will commit new crimes upon release from prison, the Static-2002R (an instrument to assist in predicting sexual and violent recidivism), and the STABLE-2007 (an instrument to assess relevant dynamic factors when assessing risk of sexual reoffense).

The results indicate that defendant fell within the well-above average or high-risk ranges using one instrument and above average need based on the other instrument. Both doctors also relied upon defendant's recent PPG test, which indicated that defendant still became sexually aroused by children, and entertained himself with anime and Disney movies, which exhibited his current identification with children. Dr. Flinton evaluated defendant's treatment progress and identified defendant's impulsivity, limited ability to develop intimate social relationships, and identification with children as current factors

24.

that need to be addressed in treatment before he can be released. Dr. Yanofsky also assessed defendant's treatment and identified defendant's refusal to explore his sexual fantasies and denial of attraction to children as exhibiting a lack of insight into his sexual offending, which affects his ability to control his behavior in the future.

We therefore reject defendant's assertion that the conclusions drawn by the prosecution's experts were solely predicated on prior sex crimes. Defendant suggests that because there was no evidence he had "current symptoms and recent objective indicia" associated with sexual deviancy, the expert opinions relied upon by the trial court were unsupportable as a matter of law. We disagree. This argument was rejected in *Sumahit*: "[D]efendant errs in supposing that he must presently engage in overt manifestations of a sexually violent predator in order to support an opinion that he still suffers from a mental disorder affecting his ability to control his impulses. The fact that defendant has not misbehaved in a strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others. Defendant has an abnormal attraction to [prepubescent] children. Because he currently lacks access to children, his lack of outward signs of sexual deviance is not dispositive of whether he is likely to reoffend if released into society at large. Such an assessment must include consideration of his past behavior, his attitude toward treatment and other risk factors applicable to the facts of his case. ([*Ghilotti, supra*,] 27 Cal.4th [at p.] 929.) This was precisely the methodology followed by the prosecution's experts." (*Sumahit, supra*, 128 Cal.App.4th at p. 353.)

Additionally, we cannot overlook the significance of defendant's reluctance to participate in that portion of the treatment that required defendant to address his sexual fantasies and his refusal to acknowledge his obvious sexual interest in prepubescent children. (See *Sumahit, supra*, 128 Cal.App.4th at p. 354 [addressing impact of the defendant's refusal to submit to treatment.]) The court was entitled to credit the opinion of the prosecution's experts that defendant's failure to complete treatment or to progress

25.

sufficiently in treatment was evidence that defendant is not yet able to control his untreated dangerousness by voluntary means.

In enacting the SVPA, "[t]he Legislature declared the need to confine and treat a 'small but extremely dangerous group of sexually violent predators,' already incarcerated, who 'are not safe to be at large and if released [at the conclusion of their prison terms] represent a danger to the health and safety of others in that they are likely to engage in acts of sexual violence.' " (*Ghilotti, supra*, 27 Cal.4th at p. 919, first bracketed insertion added, quoting Stats. 1995, ch. 763, § 1, p. 5921.) Two of the key factors which must be weighed by the evaluators in determining whether a sexual offender should be kept in medical confinement are "the person's progress, if any, in any mandatory SVPA treatment program he or she has already undergone[] [and] the person's expressed intent, if any, to seek out and submit to any necessary treatment." (*Id.* at p. 929.) A patient's refusal to cooperate in any phase of treatment may therefore support a finding that he "is not prepared to control his untreated dangerousness by voluntary means if released unconditionally to the community." (*Ibid.*)

Defendant cites *Peters v. Superior Court* (2000) 79 Cal.App.4th 845 to support his argument that recent evidence of sexual analogue behavior is necessary to support an opinion that he still suffers from a mental disorder affecting his ability to control his impulses and the lack of evidence that defendant has misbehaved, though in a strictly controlled hospital environment, proves that he no longer suffers from a mental disorder that poses a danger to others. Defendant reads that decision too broadly. In *Peters*, the court relied upon the original SVP report that evaluated Peters two years before. (*Id.* at p. 850.) The *Peters* court found that a two-year-old report was insufficient to demonstrate that Peters currently suffered from a disorder because the information was potentially stale. (*Ibid.*) This case does not support defendant's argument that the prosecution was required to present evidence that defendant's actions demonstrated that he would still sexually reoffend against children. *Peters* addressed the recency of the

expert's evaluation and conclusion that Peters qualified as an SVP. Notably, in this case, the expert evaluations had been conducted within nine to 10 months of the bench trial.[7]

Defendant argues that "[a] condition that is current, intense and manifest by a lack of self-control is, by definition, hard to hide," one would expect that it manifest repeatedly during the 11 years defendant has been in custody, and the lack of evidence as to current fantasies or sexually violent behavior undermines the experts' opinions relied upon by the court. However, this very argument was rejected in *Sumahit, supra*, 128 Cal.App.4th at page 353. The SVPA "require[s] a 'recent objective basis' for commitment in the form of the determination of two experts, credited by the trier of fact, that 'a subject presently suffers from a mental disorder which predisposes him to commit further sexually violent predatory crimes.' " (*People v. Poe* (1999) 74 Cal.App.4th 826, 833.) Such a recent objective basis is proven by current psychological symptoms, recent objective indicia of defendant's condition, and a recent objective basis for a finding that a defendant is likely to offend even without any recent pathological behavior. (See *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1161 [interpreting SVPA statutory requirements in addressing the defendant's equal protection challenge].) Defendant appears to contend that multiple expert witness opinions—based on recent information, assessments, and observations—do not constitute "recent objective indicia" of his condition but cites no authority that so holds.

We conclude that defendant's lack of sufficient progress in treatment, coupled with a valid diagnosis that he suffers from a sexual disorder affecting his volitional capacity, is sufficient to sustain the court's finding that defendant will, if released to the community,

---

[7] Dr. Flinton's evaluation report was completed on November 2, 2022, after an interview with defendant on September 23, 2022, and review of recent documents from the same month. Dr. Yanofsky's evaluation report was completed on October 26, 2022, after interviewing defendant on October 21, 2022, and reviewing documents as recent as September 2022. Thus, the court's decision was based upon information as recent as nine months prior to the May 2023 trial.

"represent a *substantial danger* of committing similar new crimes." (*Ghilotti, supra*, 27 Cal.4th at p. 924.) No further proof of current dangerousness is required.

## DISPOSITION

We affirm the order of commitment.

HILL, P. J.

WE CONCUR:


DE SANTOS, J.


FAIN, J.*

---

*       Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.